ACCEPTED
07-15-00343-CV
SEVENTH COURT OF APPEALS
AMARILLO, TEXAS
12/18/2015 3:30:14 PM
Vivian Long, Clerk

**Oral Argument Requested**

## No. 07-15-00343-CV

_____

## COURT OF APPEALS
## for the
## SEVENTH DISTRICT OF TEXAS

FILED IN
7th COURT OF APPEALS
AMARILLO, TEXAS

12/18/2015 3:30:14 PM

VIVIAN LONG
CLERK

_____

**Nancy Higginson, Debbie Cheadle, Edward Cheadle, Arthur Cheadle, Wayne Carson, Finney Cheadle, Cheryl Shoop, and Keith Sawaya,**

*Appellants*,

**v.**

**Raeanne Martin,**

*Appellee*.

_____

**Appeal from the 72nd Judicial District Court
of Lubbock County, Texas**
*Honorable Ruben G. Reyes, Presiding Judge*

_____

## BRIEF FOR APPELLEE

_____

**Terry Scarborough**
State Bar No. 17716000
tscarborough@hslawmail.com
**Hance Scarborough, L.L.P.**
400 West 15th Street
Suite 950
Austin, Texas 78701
Tel: 512-479-8888
Fax: 512-479-6891

**G. Michael Gruber**
State Bar No. 08555400
mgruber@ghetrial.com
**Michael J. Lang**
State Bar No. 24036944
mlang@ghetrial.com
**Priya A. Bhaskar**
State Bar No. 24082690
pbhaskar@ghetrial.com
**Gruber Hurst Elrod
Johansen Hail Shank LLP**
1445 Ross Avenue
Suite 2500
Dallas, Texas 75202
Tel: 214-855-6800
Fax: 214-855-6808

**Jeffrey S. Levinger**
State Bar No. 12258300
**Levinger PC**
1445 Ross Avenue
Suite 2500
Dallas, Texas 75202
Tel: 214-855-6817
Fax: 214-855-6808
jlevinger@levingerpc.com

*Attorneys for Appellee*

Pursuant to TEX. R. APP. P. 38.1(a), the following is a complete list of all parties to the trial court's judgment and the names and addresses of all trial counsel and appellate counsel.

**1.     Defendants-Appellants:**

Nancy Higginson                    Wayne Carson
Debbie Cheadle                     Cheryl Shoop
Edward Cheadle                     Finney Cheadle
Arthur Cheadle                     Keith Sawaya

**2.     Counsel for Defendants-Appellants:**

J. Paul Manning (trial and appeal)
Anna McKim (appeal)
Field, Manning, Stone, Hawthorne
   & Aycock, P.C.
2112 Indiana
Lubbock, Texas 79410

**3.     Plaintiff-Appellee:**

Raeanne Martin

**4.     Counsel for Plaintiff-Appellee:**

| | | |
|---|---|---|
| Terry Scarborough | G. Michael Gruber | Jeffrey S. Levinger |
| Hance Scarborough, L.L.P. | Michael J. Lang | Levinger PC |
| | Priya A. Bhaskar | 1445 Ross Avenue |
| 400 West 15th Street | Gruber Hurst Elrod | Suite 2500 |
| Suite 950 | Johansen Hail Shank LLP | Dallas, Texas 75202 |
| Austin, Texas 78701 | 1445 Ross Avenue | (Appeal) |
| (Trial and appeal) | Suite 2500 | |
| | Dallas, Texas 75202 | |
| | (Trial and appeal) | |

TABLE OF CONTENTS

Identity of Parties and Counsel ............................................................... i

Index of Authorities ............................................................................ iv

Statement of the Case ......................................................................... vii

Statement Regarding Oral Argument .................................................. viii

Issues Presented ................................................................................... ix

Statement of Facts and Procedural History .............................................. 1

Summary of the Argument .................................................................... 12

Argument ............................................................................................. 15

I.      Standards of Reviewing Arbitration Awards. ............................... 15

II.     The Trial Court Correctly Vacated the Arbitration Award Because the Arbitrators Exceeded Their Powers by Awarding Damages Resulting from a Stock Transfer that the Parties Agreed Is Void and Inoperative. ...... 17

        A.      Once the Arbitrators Determined that the Purported Transfer Breached the Shareholders' Agreement, Their Only Power Was to Hold that the Transfer Is Void. ...................................................... 18

        B.      The Higginson Parties' Speculation About What the Arbitrators Might Have Done Is Inconsistent With the Shareholders' Agreement, the Arbitration Pleadings, and the Law. ........................... 25

III.    The Trial Court Correctly Vacated the Arbitration Award Because the Arbitrators Exceeded Their Powers by Refusing to Accept the Parties' Settlement Agreement that Would Have Ended Their Dispute. ................... 34

        A.      Once the Parties Agreed to Settle Their Dispute, the Arbitrators Had No Power to Require Further Proceedings or to Award Damages. ...................................................... 35

        B.      Contrary to the Higginson Parties' Arguments, the Parties' Settlement Agreement Was Enforceable and Binding on the Arbitrators. ...................................................... 38

C.  The Trial Court Properly Handled the Settlement Issue....................43

IV.  The Trial Court Correctly Denied the Higginson Parties' Petition to Confirm the Arbitration Award. ...............................................................45

Prayer ...............................................................................................................47

Certificate of Compliance .................................................................................48

Certificate of Service .........................................................................................49

Appendix:

Order Granting Amended Motion to Vacate Arbitration Award
and Denying Petition to Confirm and Enforce Award of
Arbitrators, signed on September 1, 2015 (2 CR 1909-11)........................tab 1

Shareholders' Agreement between Certain Shareholders of
Russell E. Womack, Inc., dated January 1, 2008 (4 RR at PX 3).............tab 2

Plaintiffs' First Amended Original Petition in Arbitration,
dated October 1, 2014 (4 RR at PX 5)......................................................tab 3

February 5, 2015 email attaching Arbitration Award
(4 RR at PX 11) .........................................................................................tab 4

Amended Motion to Vacate or Modify Arbitration Award,
filed August 19, 2015 (2 CR 1720-33)......................................................tab 5

# INDEX OF AUTHORITIES

**Cases**

*Abraham Investment Co. v. Payne Ranch, Inc.*,
968 S.W.2d 518 (Tex. App. -- Amarillo 1998, pet. denied) ...............................32

*Bakers Union Factory No. 326 v. ITT Continental Baking Co., Inc.*,
749 F.2d 350 (6th Cir. 1984)........................................................................ passim

*Centex/Vestal v. Friendship West Baptist Church*,
314 S.W.3d 677 (Tex. App. -- Dallas 2010, pet. denied) ............................ 29, 30

*Commonwealth Land Title Ins. Co. v. Nelson*, 889 S.W.2d 312
(Tex. App. -- Houston [14th Dist.] 1994, writ denied) .......................................19

*Cooper Natural Resources, Inc. v. Int'l Union of Operating
Engineers, Local 351*, No. 4:97-CV-669-A, 1998 WL 25547
(N.D. Tex. Jan. 12, 1998)...................................................................................37

*Delta Queen Steamboat Co. v. District 2 Marine Engineers
Beneficial Ass'n*, 889 F.2d 599 (5th Cir. 1989) ...................................... 15, 22, 23

*Disney v. Gollan*, 233 S.W.3d 591 (Tex. App. --
Dallas 2007, no pet.) .........................................................................................41

*Executone Information Sys., Inc. v. Davis*, 26 F.3d 1314 (5th Cir. 1994)..............16

*Flanagan v. Martin*, 880 S.W.2d 863 (Tex. App. --
Waco 1994, writ dism'd w.o.j.)...........................................................................36

*Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671 (Tex. 2000) ...........................27

*Gulf Oil Corp. v. Guidry*, 327 S.W.2d 406 (Tex. 1959)................................ passim

*Harris v. Archer*, 134 S.W.3d 411 (Tex. App. --
Amarillo 2004, pet. denied)................................................................................20

*In re Chestnut Energy Partners, Inc.*, 300 S.W.3d 386
(Tex. App. -- Dallas 2009, pet. denied)...............................................................15

*Jamison & Harris v. Nat'l Loan Investors*, 939 S.W.2d 735
(Tex. App. -- Houston [14th Dist.] 1997, writ denied) .......................................16

*Lone Star Cotton Mills v. Thomas*, 227 S.W.2d 300
(Tex. Civ. App. -- El Paso 1949, writ ref'd n.r.e.) ...............................................22

*Nafta Traders, Inc. v. Quinn*, 339 S.W.3d 84 (Tex. 2011) .............................. 15, 18

*Padilla v. LaFrance*, 907 S.W.2d 454 (Tex. 1995) ..................................................42

*Peacock v. Wave Tec Pools, Inc.*, 107 S.W.3d 631 (Tex. App. --
Waco 2003, no pet.) .............................................................................................16

*Plains Exploration & Prod. Co. v. Torch Energy Advisors Inc.*,
___ S.W.3d ___, 2015 WL 3653330 (Tex. June 12, 2015) ...............................19

*Russ Berrie and Co., Inc. v. Gantt*, 998 S.W.2d 713 (Tex. App. --
El Paso 1999, no pet.)...........................................................................................46

*Seals v. Herzing Inc.-New Orleans*, 482 Fed. Appx. 893
(5th Cir. June 29, 2012)........................................................................................40

*Statewide Remodeling, Inc. v. Williams*, 244 S.W.3d 564 (Tex. App. --
Dallas 2008, no pet.) ............................................................................................16

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
___ U.S. ___, 130 S. Ct. 1758 (2010)..................................................................18

*Totem Marine Tug & Barge, Inc. v. North American
Towing, Inc.*, 607 F.2d 649 (5th Cir. 1979) ................................................. 30, 31

*Townes Telecommunications, Inc. v. Travis, Wolff & Co., L.L.P.*,
291 S.W.3d 490 (Tex. App. -- Dallas 2009, pet. denied) ....................... 15, 16, 23

**Rules**

TEX. R. APP. P. 44.1 .....................................................................................................45

TEX. R. CIV. P. 11....................................................................................................... passim

TEX. R. EVID. 408........................................................................................................45

**Statutes**

9 U.S.C. § 10 ................................................................................................................22

9 U.S.C. § 10(a)(4)................................................................................................. 15, 47

TEX. CIV. PRAC. & REM. CODE § 154.073..................................................................44

TEX. CIV. PRAC. & REM. CODE § 154.073(c) ...........................................................44

TEX. CIV. PRAC. & REM. CODE § 171.088(a)(3)(A).......................................... passim

**Other Authorities**

97 AM. JUR. TRIALS, *Arbitrator Selection and Service* § 121 (2005) ......................37

AAA COMM. R. 43..................................................................................................43

AAA COMM. R. 47 .................................................................................................40

AAA COMM. R. 47(a) .............................................................................................40

AAA COMM. R. 48.................................................................................................39

BLACK'S LAW DICTIONARY (6th ed. 1990) ..............................................................19

# STATEMENT OF THE CASE

*Nature of the Case:*

This case involves a dispute among the shareholders of Russell E. Womack, Inc. ("REW") concerning the right of Raeanne Martin ("Martin") to transfer her shares in REW to members of one group of shareholders ("the Byrne Parties") instead of another group of shareholders ("the Higginson Parties").

*Course of Proceedings:*

The trial court ordered Martin and the Higginson Parties to arbitrate their dispute in accordance with the Shareholders' Agreement to which they were parties. (1 CR 1253-55) The arbitrators awarded the Higginson Parties $2,000,000 in damages resulting from Martin's purported transfer of her shares to the Byrnes, along with $322,023.25 in legal fees and $5,725 in costs. (1 CR 1351; 4 RR at PX 2) The Higginson Parties petitioned the trial court to confirm the arbitration award (1 CR 1346-52), and Martin moved to vacate or modify it on the ground that the arbitrators had exceeded their powers by (1) awarding damages for a transfer that the Shareholders' Agreement provided was void and inoperative, and (2) refusing to accept a settlement agreement that would have resolved all disputes between Martin and the Higginson Parties (2 CR 1720-33 [App. 5]).

*Trial Court:*

72nd Judicial District Court of Lubbock County, Texas; Honorable Ruben G. Reyes, presiding judge.

*Trial Court's Disposition of the Case:*

After an evidentiary hearing, the trial court signed an order on September 1, 2015 granting Martin's motion to vacate the arbitration award and denying the Higginson Parties' petition to confirm the award. (2 CR 1909-11 [App. 1])

## STATEMENT REGARDING ORAL ARGUMENT

Given the relative size and complexity of the record in this case, Appellee believes that oral argument may significantly aid this Court's decisional process.

## ISSUES PRESENTED

1. Did the trial court correctly grant Martin's motion to vacate the arbitrators' award of $2,000,000 in damages and $322,023.25 in legal fees, when (1) the parties' Shareholders' Agreement provided that the sole remedy for a stock transfer in breach of the Agreement was to void the purported transfer and return the shares to the breaching transferor, and (2) the arbitrators thus exceeded their powers by awarding damages for a purported stock transfer that the parties agreed would be treated as if it had never happened?

2. Did the trial court correctly grant Martin's motion to vacate the arbitrators' award on the alternative ground that (1) the parties agreed to settle their dispute and submitted an agreed "Arbitration Award" to the arbitrators, and (2) the arbitrators exceeded their powers by refusing to approve the settlement agreement and instead proceeding to a hearing where they issued an award inconsistent with the parties' settlement agreement?

3. Having correctly granted Martin's motion to vacate the arbitration award, did the trial court also correctly deny the Higginson Parties' petition to confirm the arbitration award?

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

The Higginson Parties' "statement of facts" has the virtue of being brief, but the result is that it omits or glosses over many important facts -- both historical and procedural -- that demonstrate why the trial court was correct in vacating the $2.3 million arbitration award against Martin. The following statement will attempt to fill in the missing gaps.

### 1. The Parties' Agreements

Russell E. Womack was the sole shareholder of Russell E. Womack, Inc. ("REW"), a closely-held Texas corporation. (1 CR 10, 1357) Upon his death, his entire estate, including his stock in REW, was left to his and his late wife's nieces and nephews. (1 CR 10, 1357) Through inheritance and transfers, three groups of family members came to own the stock in REW:

- **The Higginson Parties**, which included Nancy Higginson, Debbie Cheadle, Edward Cheadle, Arthur Cheadle, Wayne Carson, Finney Cheadle, Cheryl Shoop, and Keith Sawaya.

- **Raeanne Martin**.

- **The Byrne Parties**, which included Michael Byrne, Richard Byrne, James Byrne, Jr., Barbara Holladay, West Womack, and Carolyn Cain.

(1 CR 10, 967) Importantly, none of these groups owned or controlled a majority of the REW shares -- even if every person in each group had voted together. (1 CR 967)

1

In 2007, shortly after the final disposition of Womack's estate, Nancy Higginson proposed that Martin and the Higginson Parties consolidate the voting power of their shares in order to obtain majority control over REW. (1 CR 11) To that end, Martin and the Higginson Parties entered into a Voting Trust Agreement dated December 31, 2007 and a Shareholders' Agreement between Certain Shareholders of Russell E. Womack, Inc. dated January 1, 2008. (1 CR 20, 38; 4 RR at PX 3 [App. 2], PX 4)

The stated purpose of the Voting Trust Agreement was to "concentrat[e] the vote of the shares represented under this Agreement into a clear and definite policy of management under the discretion of the Voting Trustees." (1 CR 38; 4 RR at PX 4, § 1.2) Nancy Higginson and Debbie Cheadle were named as the Trustees, with the power to take control of the stock certificates of the parties who signed the Agreement and to vote the shares "in their unrestricted discretion." (1 CR 38, 40; 4 RR at PX 4, §§ 2.1(b), 5.1) Because Martin was reluctant to permanently commit her vote to the Trustees, the Voting Trust Agreement included a "revocation option," applicable to her and her brother Wayne Carson, that permitted them to opt out of the Agreement at certain times. (1 CR 11-12, 45; 4 RR at PX 4, § 8.1)

The Shareholders' Agreement had a similar purpose -- to "secure continuity and stability of the policies of the management of [REW]" by requiring the parties who signed it to "agree to restrict the transfer of Shares under certain circumstances."

(1 CR 21; 4 RR at PX 3, Art. 1) To effectuate that purpose, the Shareholders' Agreement prohibited stock transfers "except in accordance with and subject to the terms and conditions of this Agreement." (1 CR 23-24; 4 RR at PX 3, § 3.1) Transfers "to any Person who is not a party to this Agreement" were prohibited, and even permitted transfers were subject to a right-of-first-refusal by the other parties to the Agreement. (1 CR 23-24; 4 RR at PX 3, §§ 3.2, 3.3)

Importantly, the Shareholders' Agreement also specified precisely what the remedy would be in the event of a stock transfer that breached the Agreement:

> 9.2 <u>Breach and Equitable Relief</u>. *Any purported Transfer in breach of any provision of this Agreement is void, will not operate to Transfer any interest or title in the purported transferee, and will constitute an offer by the breaching Shareholder to sell his Shares to the Corporation* at the purchase price per Share determined pursuant to <u>Section 7.2(b)</u>. In connection with any attempted Transfer in breach of this Agreement, the Corporation may refuse to transfer any Shares or any stock certificate tendered to it for Transfer, in addition to and without prejudice to any other rights or remedies available to the Corporation. Each party to this Agreement acknowledges that each other party will suffer immediate and irreparable harm if a party hereto breaches, attempts to breach, or threatens to breach this Agreement and that monetary damages will be inadequate to compensate the nonbreaching parties for any actual, attempted, or threatened breach. Accordingly, each party hereto agrees that each of the other parties will, in addition to any other remedies available to them at law or in equity, be entitled to specific performance or temporary, preliminary, and permanent injunctive relief to enforce the terms and conditions of this Agreement without the necessity of proving inadequacy of legal remedies or irreparable harm, or posting bond, any requirements to equitable and injunctive relief being hereby specifically waived.

(1 CR 32; 4 RR at PX 3, § 9.2) (emphasis added) Finally, the Shareholders' Agreement required the parties to mediate and arbitrate their disputes under the Agreement. (1 CR 34-35; 4 RR at PX 3, § 12.5)

Over time, Martin became dissatisfied with Nancy Higginson's management of REW, particularly because of the company's failure to make distributions. (1 CR 12, 1358) In the summer of 2012, Michael Byrne -- who served as co-president of REW along with Nancy Higginson -- told Martin that she was not receiving distributions because the Higginson Parties had saddled REW with excessive debt to the point that its lender had prohibited distributions. (1 CR 1358) Byrne also told her that REW's financial condition would improve if he managed the business, and he sought her vote. (1 CR 1358) In December 2012, Martin exercised her right to opt out of the Voting Trust Agreement, and she withdrew her share certificates from the voting trust. (1 CR 391-92)

On February 28, 2013, Michael and Richard Byrne offered to buy Martin's 70 shares in REW for $3,130,000. (4 RR at PX 6) Martin "conditionally accepted" the Byrnes' offer, expressly reserving the "right to withdraw from the proposed transaction without penalty at any time prior to closing and receipt by her of the payment due to her under the terms of [the Byrnes'] offer." (4 RR at PX 7) By letter dated March 5, 2013, the Byrnes agreed to the terms of Martin's conditional acceptance of their offer. (4 RR at PX 45)

Although Martin and her attorney did not believe that the Shareholders' Agreement was enforceable -- either to restrict any transfer of her shares or to give the Higginson Parties any right to match an offer to buy her shares -- her counsel nonetheless advised the Higginson Parties, as "a courtesy," of the Byrnes' offer and Martin's conditional acceptance and right to withdraw from it. (4 RR at PX 41, 42) On March 18, 2013, the Higginson Parties purported to accept the $3,130,000 offer for Martin's shares, as reflected in the Byrnes' February 28 letter and Martin's conditional acceptance. (4 RR at PX 43)

## 2. The Parties' Lawsuits

Faced with competing demands for her shares, Martin filed suit against the Higginson Parties and the Byrne Parties in the 72nd Judicial District Court. (1 CR 7-18; 4 RR at PX 8) In her suit, Martin sought a declaratory judgment that (1) the Shareholders' Agreement is unenforceable and does not give the Higginson Parties a preemptive right to purchase her shares; (2) she has the right to withdraw from any sale of her shares before closing; and (3) in the event the Shareholders' Agreement is enforceable, the Higginson Parties' sole remedy is to void any transfer she purported to make, as set forth in section 9.2. (1 CR 14-17; 4 RR at PX 8)

The Higginson Parties responded by filing their own counter-petition for declaratory relief, asking the court to prohibit the transfer, find that they had a right of first refusal to acquire Martin's shares, and order her to sell them her shares. (1

CR 66, 72-80) They also sought a temporary restraining order to prevent the transfer of Martin's shares. (1 CR 77-80) Martin agreed to the TRO and one extension of it. (1 CR 346-49, 396-98) But when the TRO subsequently expired on September 13, 2013 and was not extended by the trial court (1 Supp. RR 60), Martin purported to transfer her shares to the Byrnes on September 23, 2013 (1 CR 1064, 1088).

Having failed to stop the transfer, the Higginson Parties amended their counter-petition to specifically allege that Martin's transfer to the Byrnes "is a direct violation of the Shareholder Agreement [and] *said transfer is void per the Shareholder Agreement*." (1 CR 1058, 1064, 1072) (emphasis added) Although the Higginsons continued to seek declaratory and injunctive relief from the court (1 CR 1065-73), they later changed course by asking the court to compel arbitration of the dispute between themselves and Martin, to the exclusion of the Byrne Parties (1 CR 1155-59, 1211-14). Martin objected to such a piecemeal resolution of the dispute (1 CR 1140, 1143, 1215-19), but the court ultimately compelled only the Higginson Parties and Martin to arbitrate (1 CR 1253-55). The Byrne Parties declined to voluntarily participate in the arbitration. (1 CR 1205, 1209, 1254)

### 3. The Arbitration

In April 2014, arbitration commenced before a three-person panel of the American Arbitration Association. (1 CR 1360; 4 RR at DX E) There, the Higginson Parties changed course once again; instead of reasserting their previous

6

allegation that Martin's purported transfer of her shares to the Byrnes "is a direct violation of the Shareholder Agreement [and] is void per the Shareholder Agreement" (1 CR 1064), the Higginson Parties alleged that the transfer was a breach of the Shareholders' Agreement that resulted in *damages* to the Higginson Parties (1 CR 1381-97; 4 RR at PX 5 [App. 3]). Specifically, the Higginson Parties' amended arbitration petition alleged in pertinent part:

> 43. *Martin's breach of contract in transferring the shares subject of the Shareholder Agreement to a non-contracting party is a natural, probable, and foreseeable consequence of the damages suffered by the Carson Family collectively and individually.* Pursuant to the Shareholder Agreement, the Carson Family is entitled to all legal remedies available to them for the breach of the Shareholder Agreement by Martin. . . .

> 44. *Accordingly, the Carson Family chooses to seek only actual monetary damages against Martin which include but are not limited to economic damages from the dimunition in value of their respective shares*, expectation and reliance damages, unjust enrichment, nominal damages, pre-judgment and post-judgment interest, attorney fees, and costs.

(1 CR 1393-94; 4 RR at PX 5) (emphasis added) The Higginson Parties also designated a damages expert, who purported to calculate the "diminution in value" of their shares resulting from Martin's transfer of her shares to the Byrnes in violation of the Shareholders' Agreement. (4 RR at PX 5, 21)

In response, Martin contended -- in both her answering statement and in a dispositive motion -- that she was not liable because the Shareholders' Agreement was unenforceable. (4 RR at DX B, DX F) She also asserted that damages were not

7

available to the Higginson Parties -- and the arbitrators had no authority to award them -- because the parties had agreed in section 9.2 of the Shareholders' Agreement that the sole remedy for a transfer in breach of the Agreement was to "void" the transfer and treat it as if it had never occurred. (*Id.*)

Moreover, to make sure that the Higginson Parties were locked into their claim for damages (which Martin contended were unavailable under the Shareholders' Agreement), Martin filed a motion asking the arbitrators "to limit remedies, or in the alternative, to dismiss for absence of indispensable parties." (3 RR 58-59; 4 RR at DX C) The arbitrators granted the motion and ordered that the Higginson Parties "shall be bound in this proceeding . . . to the representation made in paragraph 44 of the First Amended Original Petition in Arbitration" -- stating that they "choose[ ] to seek only actual monetary damages against Martin" -- and "shall be permitted to assert only monetary damages remedies against [Martin] in this arbitration." (4 RR at DX E)[1]

Several months later, after Martin filed her dispositive motion arguing that damages were not recoverable, Martin and the Higginson Parties settled all of their disputes. (3 RR 41; 2 CR 1730) On February 5, 2015, the Higginson Parties'

---

[1] As noted above, paragraph 44 began with the word "[a]ccordingly," indicating that it was based upon the allegations in Paragraph 43. Paragraph 43, in turn, alleged that both liability and damages were based *solely* on Martin's transfer of her shares to the Byrnes. (4 RR at PX 5)

counsel sent an email to the AAA administrator and the arbitrators attaching an "Arbitration Award approved as to form by the attorneys of record." (3 RR 30-32; 4 RR at PX 11 [App. 4]) The Arbitration Award, which was attached to the email, stated:

> After consideration of the evidence, arguments, and authorities presented by counsel for the parties, The Panel finds in favor of Claimants that the "Shareholders Agreement Between Certain Shareholders of Russell E. Womack, Inc." dated January 1, 2008 ("Shareholder Agreement") is valid and enforceable and that Respondent breached the "Shareholder Agreement" by failing to sell and transfer her shares in Russell E. Womack, Inc. to Claimants. The Panel further finds that *under the provisions of the Shareholder Agreement the transfer of shares by Respondent to Michael Byrne and Richard Byrne is void*, that Claimants are entitled to specific performance of the sale and transfer of Respondent's shares in Russell E. Womack, Inc. *and as a result, the Claimants do not have a monetary damage remedy against Respondent for breach of the Shareholder Agreement*. These findings do not preclude all or any of the other remedies that may be available to Claimants either under the Shareholder Agreement, or otherwise available at law or in equity.

> The Panel further finds the administrative fees and expenses of the American Arbitration Association total _____ and the compensation and expenses of the Arbitrators total _____.

> The Panel further finds that an award of costs of arbitration and attorneys' fees in favor of Claimants as the prevailing parties on the issue of whether Respondent breached the Shareholder Agreement is justified, and hereby awards Claimants the sum total of $400,000.00 determined for arbitration fees, costs and reasonable and necessary attorneys' fees attributable to Claimants' claim against Respondent.

(4 RR at PX 11) (emphasis added, blanks in original) Accordingly, all the arbitrators had to do was fill in the amounts of their fees and the AAA's fees (neither of which

9

had been determined at the time), and Martin would pay the Higginson Parties whatever amount was left, up to the agreed-upon cap of $400,000. (4 RR at PX 11) As Martin's counsel later testified, the dispute between Martin and the Higginson Parties would then be "fully resolved" and the arbitration "was over." (3 RR 33, 36-37, 41, 62)

Despite the parties' settlement agreement, the arbitrators refused to accept or sign the Arbitration Award the parties had submitted to them on February 5. (3 RR 55; 4 RR at PX 13, 14) Because the arbitrators would not accept the parties' Arbitration Award, and Martin was unwilling to amend the terms of the parties' settlement agreement to meet the arbitrators' requests, the arbitration went to final hearing on May 26, 2015. (4 RR at PX 2, PX 13) Following three days of testimony, the arbitrators issued a "standard award" on June 26, 2015, finding Martin liable for "the total sum of $2,000,000.00 in damages plus legal fees in the amount of $322,023.25" and costs of $5,725. (1 CR 1351; 4 RR at PX 2)

### 4. The trial court's rulings

On July 7, 2015, the Higginson Parties returned to the trial court and filed a petition to confirm the arbitration award. (1 CR 1346-52) They also filed (but later non-suited) a cross-claim against the Byrne Parties seeking the same damages the arbitrators had awarded against Martin. (1 CR 1332-45; 2 CR 1523-25) For her part, Martin filed an amended petition asserting a variety of contract and tort theories

10

against Michael and Richard Byrne (2 CR 1402-18), as well as a motion to vacate or modify the arbitration award (2 CR 1445-53, 1720-33 [App. 5]).  Martin asserted two primary grounds for vacating or modifying the award: (1) the arbitrators had exceeded their powers by issuing an award of damages for a purported stock transfer that the parties agreed would be treated as void; and (2) the arbitrators exceeded their powers by refusing to accept the parties' settlement agreement and to enter an agreed award that would have ended their dispute.  (2 CR 1727-31)[2]

The trial court held a lengthy hearing on both parties' motions on August 25, 2015.  (3 RR 1-150)  At the outset, the parties stipulated to the admissibility of certain exhibits.  (3 RR 9-10)  The court then asked the parties to identify the statutory grounds for confirming or vacating the arbitration award; Martin cited to provisions of the Texas Arbitration Act, while the Higginson Parties stated that they were seeking confirmation under both the TAA and the Federal Arbitration Act.  (*Id*. at 10-12)  In support of their petition to confirm the award, the Higginson Parties relied solely upon "the evidence that's already been submitted to the Court and admitted," and then rested.  (*Id*. at 14)  Martin, in contrast, presented testimony from

---

[2] Martin also asserted that the arbitrators exceeded their powers by issuing an award for damages that arose under the Voting Trust Agreement, which did not have an arbitration clause. (2 CR 1726-27)  But Martin did not urge that argument at the hearing on her motion to vacate, and she does not urge it here.  Accordingly, this Court need not address the Higginson Parties' argument on pages 17-20 of their brief concerning the relationship between their claim of damages and the Voting Trust Agreement.

her trial and arbitration attorney about: (1) the parties' settlement agreement that the arbitrators refused to accept; and (2) his effort to pin down the Higginson Parties to a claim for damages that were not available as a remedy under the Shareholders' Agreement. (*Id*. at 29-65)  After extensive oral argument -- in which the trial court was actively engaged -- the court took the motions under advisement. (*Id*. at 66-150)

On September 1, 2015, the trial court signed an order granting Martin's motion to vacate the arbitration award and denying the Higginson Parties' petition to confirm the award. (2 CR 1909-11 [App. 1])  The court also signed a scheduling order setting the case for trial in September 2016. (2 CR 1907)  The Higginson Parties timely appealed from the order vacating the arbitration award. (2 CR 1912-13)

## SUMMARY OF THE ARGUMENT

Because arbitration is a creature of contract, arbitrators necessarily derive their powers from the parties' agreements. These agreements include pre-arbitration contracts and post-arbitration settlements. If the arbitrators issue an award that is inconsistent with or in disregard of the parties' agreements, the arbitrators will exceed their powers and trial courts have the statutory authority under both the Texas Arbitration Act and the Federal Arbitration Act to vacate the arbitrators' award. In this case, the arbitrators' award of $2,000,000 in damages and nearly $325,000 in

legal fees exceeded the powers conferred upon them in two independent respects, and the court below was correct in vacating the arbitrators' award on either ground.

First, the arbitrators' award of damages and legal fees exceeded the powers conferred upon them by the parties' Shareholders' Agreement, which contained both the arbitration clause and the relevant provisions dealing with the stock transfer at issue in this dispute. In the Shareholders' Agreement, the parties specifically agreed that there would be only one remedy for a stock transfer that breached the Agreement -- namely, to "void" the purported transfer and render it inoperative, and to return the shares to the breaching transferor so that they could be offered to the corporation. Based on the meaning and legal effect of the term "void," it is *impossible* for the nonbreaching party to sustain any "damages" from a breaching stock transfer that the Shareholders' Agreement treats as a nullity. The effect of this remedial limitation here is that once the arbitrators determined that Martin's transfer of her shares to the Byrnes breached the Shareholders' Agreement, their *only* power was to "void" the transfer. By instead awarding $2,000,000 in damages for a transfer the parties agreed to treat as a nullity, the arbitrators exceeded their powers. And the Higginson Parties' present speculation about the "multiple scenarios" that might support an award of damages (Br. at 10) does not help them in the least, because the arbitrators still would have exceeded their powers if they had done what the Higginson Parties suggest.

13

Second, the arbitrators' award exceeded the powers conferred upon them as a result of the parties' post-arbitration settlement agreement, which was embodied in an "Arbitration Award" that the parties asked the arbitrators to sign in order to end their dispute. The arbitrators, however, refused to accept the settlement agreement and instead forced the parties to proceed to a hearing, where the arbitrators issued a vastly different award from what the parties had agreed to in their settlement. In so doing, the arbitrators exceeded their powers under the statute and relevant case law. Contrary to the Higginson Parties' contentions, neither the rules of the American Arbitration Association nor Rule 11 of the Texas Rules of Civil Procedure permitted the arbitrators to simply ignore and override the parties' binding settlement agreement. And even if Rule 11 applied in the context of an arbitration proceeding, it was satisfied here because the settlement agreement contained all the essential terms, was signed by counsel on behalf of all parties, and was filed (and properly admitted into evidence) at the trial court's hearing on whether the arbitrators' award should be vacated or confirmed.

Because the trial court therefore was correct in vacating the arbitrators' award on the ground that it exceeded their powers, the court was also correct in declining to confirm the award. The trial court's order vacating the award is consistent with the statute and the case law, and it should be affirmed in its entirety.

## I.    Standards of Reviewing Arbitration Awards.

Review of a trial court's decision to vacate or confirm an arbitration award is de novo and the appellate court reviews the entire record. *See In re Chestnut Energy Partners, Inc.*, 300 S.W.3d 386, 397 (Tex. App. -- Dallas 2009, pet. denied). Although courts favor arbitration and ordinarily give deference to arbitration awards, both the Texas Arbitration Act and the Federal Arbitration Act authorize courts to vacate arbitration awards whenever "the arbitrators exceeded their powers." TEX. CIV. PRAC. & REM. CODE § 171.088(a)(3)(A); 9 U.S.C. § 10(a)(4). Arbitrators derive their power from the parties' agreement to submit to arbitration, *Nafta Traders, Inc. v. Quinn*, 339 S.W.3d 84, 90 (Tex. 2011), and arbitrators will "exceed their power when they decide matters not properly before them." *Townes Telecommunications, Inc. v. Travis, Wolff & Co., L.L.P.*, 291 S.W.3d 490, 493 (Tex. App. -- Dallas 2009, pet. denied). When that occurs, the Texas Supreme Court has made clear that the arbitrators' award is "in excess of their jurisdiction *and void*." *Gulf Oil Corp. v. Guidry*, 327 S.W.2d 406, 408 (Tex. 1959) (emphasis added).[3]

---

[3] The United States Court of Appeals for the Fifth Circuit has made the same point. *See Delta Queen Steamboat Co. v. Dist. 2 Marine Engineers Beneficial Ass'n*, 889 F.2d 599, 602 (5th Cir. 1989) (holding that "judicial deference is at an end" when "the arbitrator exceeds the express limitations of his contractual mandate").

In determining whether arbitrators have exceeded their powers, courts ordinarily consider the parties' agreement to arbitrate, their arbitration pleadings, and the arbitrators' award. *See, e.g., Peacock v. Wave Tec Pools, Inc.*, 107 S.W.3d 631, 638-39 (Tex. App. -- Waco 2003, no pet.); *Executone Information Sys., Inc. v. Davis*, 26 F.3d 1314, 1323 (5th Cir. 1994). Given "the nature of the error asserted" in cases challenging the arbitrators' exercise of their powers, appellate courts do not require or need an entire record of the arbitration proceedings. *Townes Telecommunications*, 291 S.W.3d at 493 n.2. These types of challenges are inherently different from record-intensive challenges involving the arbitrators' partiality, their evidentiary rulings, or claims of fraud, misconduct, or gross mistake. *See, e.g.*, *Statewide Remodeling, Inc. v. Williams*, 244 S.W.3d 564, 568 (Tex. App. -- Dallas 2008, no pet.) (complete record of arbitration hearing is required when award is challenged based on arbitrator's mistake and failure to exercise honest judgment); *Jamison & Harris v. Nat'l Loan Investors*, 939 S.W.2d 735, 737 (Tex. App. -- Houston [14th Dist.] 1997, writ denied) (record of arbitration hearing is required when challenge is based on arbitrator's refusal to hear evidence and errors of law).

In this case, Martin's motion to vacate the arbitration award was based solely on the arbitrators having "exceeded their powers." TEX. CIV. PRAC. & REM. CODE § 171.088(a)(3)(A). And as the following discussion will show, the arbitrators

16

exceeded their powers in two independent ways -- first, by awarding damages for a purported stock transfer that the parties previously agreed would be "void" and treated as if it had never occurred; and second, by refusing to accept the parties' settlement agreement reached during the arbitration proceeding that would have ended their dispute.

## II. The Trial Court Correctly Vacated the Arbitration Award Because the Arbitrators Exceeded Their Powers by Awarding Damages Resulting from a Stock Transfer that the Parties Agreed Is Void and Inoperative.

The Higginson Parties' arbitration claims against Martin were based on three propositions:

- the Shareholders' Agreement is enforceable;

- Martin breached the Shareholders' Agreement by transferring her shares in REW to the Byrnes; and

- the breaching stock transfer to the Byrnes resulted in damages to the Higginson Parties measured by the "diminution in value" of their shares.

(4 RR at PX 5)  But as the trial court correctly and succinctly stated, these claimed damages "stem from a transfer that, by the [Shareholders'] [A]greement itself, *could not happen because it was void, not voidable*."  (3 RR 79) (emphasis added)  Because the parties thus contracted for an exclusive remedy in the event of a stock transfer that breached the Shareholders' Agreement -- namely, to treat it as void and inoperative -- the arbitrators had no power to ignore that exclusive contractual remedy and award damages instead.  The Higginson Parties' current effort to divine

17

some alternative explanation for why the arbitrators could award damages is inconsistent with the Shareholders' Agreement, the arbitration pleadings, and the law.

**A.** **Once the Arbitrators Determined that the Purported Transfer Breached the Shareholders' Agreement, Their Only Power Was to Hold that the Transfer Is Void.**

Arbitration is a creature of contract, and arbitrators derive their powers from the parties' agreements about the issues subject to arbitration. *See Nafta Traders*, 339 S.W.3d at 90 (citing *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, ___ U.S. ___, 130 S. Ct. 1758, 1773-74 (2010)). As such, courts are responsible for scrutinizing arbitration awards to ensure that the arbitrators acted in conformity with the parties' agreements. *See Gulf Oil*, 327 S.W.2d at 408. This analysis consists of two steps -- interpreting the parties' applicable agreements, and determining whether the arbitrators' award exceeded the scope of those agreements. Following these steps in this case leads to only one proper conclusion -- that the arbitrators exceeded their powers by awarding damages resulting from a purported stock transfer that the parties had previously agreed would be remedied solely by treating it as null and void, thus incapable of causing any damages.

When courts construe a contract, their "primary objective is to ascertain the parties' true intentions as expressed in the language they chose." *Plains Exploration & Prod. Co. v. Torch Energy Advisors Inc.*, ___ S.W.3d ___, 2015 WL 3653330, at

*7 (Tex. June 12, 2015). Here, the parties agreed in section 12.5 of the Shareholders' Agreement that "any unresolved controversy or claim relating to this Agreement or breach thereof will be settled by binding arbitration." (4 RR at PX 3, § 12.5) They further agreed that any transfer of shares to a non-contracting party is prohibited (*id*. at § 3.2), and specified precisely what the remedy would be in the event of a transfer that breached the Agreement:

> Any purported Transfer in breach of any provision of this Agreement is void, and will not operate to transfer any interest or title in the purported transferee, and will constitute an offer by the breaching Shareholder to sell his Shares to the Corporation. . . .

(*Id*. at § 9.2) This provision is unambiguous, and it treats a breaching stock transfer as if it had never occurred by simply nullifying it and returning the transferred shares to the transferor to be offered to REW.

Moreover, based on the meaning and legal effect of the term "void" in section 9.2, it is *impossible* for a nonbreaching party to sustain any "damages" from a purported transfer in breach of the Shareholder Agreement. The term "void" means:

> Null; ineffectual; nugatory; having no legal force or binding effect; unable, in law, to support the purpose for which it was intended. . . . An instrument or transaction which is wholly ineffective, inoperative, and incapable of ratification and which thus has no force or effect so that nothing can cure it.

*Commonwealth Land Title Ins. Co. v. Nelson*, 889 S.W.2d 312, 318 (Tex. App. -- Houston [14th Dist.] 1994, writ denied) (citing BLACK'S LAW DICTIONARY 1573 (6th ed. 1990)). As a matter of simple logic, no damages can result from a

19

transaction -- such as a stock transfer in breach of the Shareholders' Agreement -- that the parties have agreed must be treated as if it had never occurred. And the law is to the same effect: if a transaction is merely *voidable*, the nonbreaching party has the right either to rescind it or to ratify it and sue for damages; but if the transaction is *void*, the nonbreaching party's only right is to treat it as if it were a nullity from its inception. *See, e.g., Harris v. Archer*, 134 S.W.3d 411, 427, 445-46 (Tex. App. -- Amarillo 2004, pet. denied).

Because the Higginson Parties and Martin thus agreed to an exclusive remedy in the event of a breaching stock transfer -- namely, voiding the purported transfer and returning the shares to the breaching transferor to be offered to REW -- the arbitrators' powers were subject to, and limited by, the parties' contractual remedy. Accordingly, once the arbitrators in this case found that the Shareholders' Agreement was enforceable and had been breached by Martin's purported transfer of her shares to the Byrnes, they had no power to do anything other than honor the parties' agreed remedy of voiding the transfer. Indeed, to award damages was to recognize the effectiveness of a transfer that section 9.2 prohibited anyone from treating as effective. By awarding damages instead of honoring the parties' agreed-upon remedy for a breaching transfer, the arbitrators exceeded the powers conferred upon them by the parties, and the trial court correctly vacated their damages award on that statutory ground.

20

Importantly, the trial court's ruling is entirely consistent with that of other courts faced with arbitration awards that similarly exceeded the arbitrator's powers. In *Gulf Oil Corp. v. Guidry*, for example, an agreement between an employer and its employees' union reserved to the employer the right to discharge or suspend employees "for cause," but provided that a three-person arbitration panel would decide whether a discharge in fact was "for cause." 327 S.W.2d at 407. After the employer discharged one of its employees for fighting with another, the arbitrators determined that: (1) the discharge was "unreasonably discriminatory"; (2) the employee should not be discharged but instead should be demoted to his former job without eligibility for promotion; and (3) he should be paid "back wages." *Id*. In determining whether this award exceeded the arbitrators' powers, the Texas Supreme Court did not question that the arbitrators' first determination "implied a finding that cause did not exist for [the employee's] discharge" and thus was within the scope of their authority. *Id*. at 408. But the Court held that the arbitrators' remedial rulings represented an "attempt to determine matters not submitted to their determination" and therefore were "in excess of their jurisdiction and void." *Id*. And the Court so held even though "a decision favorable to [the employee] on the

only question submitted to arbitration would not have solved the controversy between the parties completely." *Id.*[4]

The U.S. Court of Appeals for the Fifth Circuit reached a similar result in *Delta Queen Steamboat Company v. District 2 Marine Engineers Beneficial Association*, 889 F.2d 599 (5th Cir. 1989), holding that the arbitrator's award was in excess of his power under 9 U.S.C. § 10. There, the employer and the employees' union agreed that an arbitrator would determine whether "proper cause" existed for the discharge of an employee, but that the employer would have responsibility for disciplinary action if proper cause did exist. *Id.* at 601, 604. After the employer discharged one if its riverboat captains following a near-accident on the Mississippi River, the arbitrator found that the captain had been "grossly careless" in his exercise of professional judgment but ordered the employer to reinstate him with back pay because he had been "the victim of disparate company discipline." *Id.* at 601. Noting that "judicial deference is at an end" when "the arbitrator exceeds the express limitations of his contractual mandate," *id.* at 602, the Fifth Circuit "vacated that portion of the arbitral award requiring reinstatement." *Id.* at 604. The court reasoned

---

[4] Based on similar facts, the court held in *Lone Star Cotton Mills v. Thomas*, 227 S.W.2d 300, 307 (Tex. Civ. App. -- El Paso 1949, writ ref'd n.r.e.), that an arbitration panel exceeded its authority in ordering an employer to reinstate and pay damages to a discharged employee because the parties had agreed that the arbitrators had the power only to determine whether the discharge was "unjust." The court stated: "Unless the arbitrator is given the power to award damages or order reinstatement, an award attempting to do this is void and beyond the[ir] power." *Id.*

22

that the arbitrator, having found the employee to be grossly careless, "impliedly found proper cause for discipline, [and] [t]hat being so, the arbitrator was without authority, under the collective bargaining agreement, to reinstate [the employee]." *Id*.

Even outside the context of labor arbitrations, courts have not hesitated to vacate arbitration awards that exceed the powers conferred on them by the parties' pre-arbitration agreements. Thus, in *Townes Telecommunications*, the Dallas Court of Appeals reviewed an arbitration award that allocated costs between the parties to the arbitration. 291 S.W.3d at 491-92. Although the court recognized "compelling reasons" for the arbitrators' decision to allocate costs between the parties, it nonetheless vacated the award because the parties' arbitration agreement specifically required costs to "be borne entirely by the non-prevailing party" and prohibited costs from being "allocated between the parties." *Id*. at 492-93. Given this remedial limitation, the court held that "the panel acted in direct contravention of the agreement and exceeded the powers granted to them by the parties" when it allocated the arbitration costs and refused to designate a non-prevailing party. *Id*. at 494.

*Gulf Oil*, *Delta Queen*, and *Townes Telecommunications* fully support -- indeed, compelled -- the ruling of the trial court here that the arbitrators' award of damages and legal fees exceeded the powers conferred upon them by the Shareholders' Agreement. Although the parties agreed that the arbitrators had the

power to determine whether the Shareholders' Agreement was enforceable and had been breached by Martin's purported transfer of shares to the Byrnes, the parties also agreed to precisely what would happen as a remedy in the event of a breaching stock transfer -- namely, the purported transfer would be voided, the shares would remain with Martin, and they would be offered to REW. (4 RR at PX 3, § 9.2) Accordingly, once the arbitrators determined that the Shareholders' Agreement was enforceable and that Martin had breached it by transferring her shares to the Byrnes -- a determination that is implicit in the arbitrators' finding of liability on the part of Martin -- the arbitrators had to simply *stop*. They had no authority to exceed the scope of the parties' contractual remedy by awarding damages for a void transfer. And as *Gulf Oil* makes plain, the possibility that voiding the transfer might "not have solved the controversy between the parties completely" does not justify a self-imposed arbitral remedy that exceeds what the parties had previously agreed upon. *Gulf Oil*, 327 S.W.2d at 408.

For all these reasons, the trial court was correct in vacating the arbitrators' award of over $2.3 million in damages and legal fees. The court's September 1, 2015 order therefore should be affirmed in its entirety.

**B.  The Higginson Parties' Speculation About What the Arbitrators Might Have Done Is Inconsistent With the Shareholders' Agreement, the Arbitration Pleadings, and the Law.**

Unable to justify the arbitrators' award of damages for a breaching stock transfer that the parties agreed to treat as void and inoperative, the Higginson Parties spend eight pages conjuring up "different scenarios" they contend would have supported an award of damages.  (Br. at 20-28)    But none of these scenarios -- especially the notion that the stock transfer prevented the Higginson Parties from being "allowed to exercise their right of first refusal" (Br. at 20) -- can support any award of damages.  To the contrary, each one is irreconcilable with the Shareholders' Agreement, with the Higginson Parties' own submissions to the arbitrators, and with Texas law.  Thus, the arbitrators would have exceeded their powers if they had done what the Higginson Parties suggest.

*"Loss of Shares to the Corporation"*:  Section 9.2 of the Shareholders' Agreement provides that any purported transfer of shares in breach of the Agreement is void, will not operate to transfer the shares to the purported transferee, and "will constitute an offer by the breaching Shareholder to sell his Shares to the Corporation" at a defined purchase price.  (4 RR at PX 3, § 9.2)  Seizing upon the quoted language, the Higginson Parties postulate that the arbitrators potentially could have found damages from the possibility that REW would transfer Martin's shares "somewhere," causing the Higginson Parties to incur "a loss of opportunity

25

to obtain majority control." (Br. at 21-22) For at least three reasons, this speculative scenario cannot support any award of damages.

First and foremost, the scenario is entirely premature -- since the Higginson Parties refused to pursue the agreed-upon remedy of voiding the purported transfer, Martin has not yet offered to sell her shares to REW in accordance with section 9.2. Thus, there is no way to know whether REW will exercise its option to acquire Martin's shares or what REW will do with the shares after acquiring them. Moreover, even if REW were to exercise its option to acquire Martin's shares, that is precisely what the Higginson Parties agreed to in section 9.2; as a matter of law, they cannot be "damaged" from an event they agreed to, especially when the result is merely to place Martin's shares in the neutral hands of REW. Finally, as discussed in detail below, the Higginson Parties' suggestion that the arbitrators compensated them for "a loss of opportunity to obtain majority control" (Br. at 21) is insupportable because the Higginson Parties never sought such a remedy from the arbitrators. And it would be foreclosed, in any event, by the exclusive remedy in section 9.2.

***"Loss of Shares to Appellee"***: For similar reasons, the Higginson Parties cannot justify the arbitrators' damages award by complaining about the shares "being returned to the hand of [Martin]" once her purported transfer is treated as void. (Br. at 22) First of all, that remedy is precisely what the Higginson Parties agreed to, and they cannot be "damaged" from the very outcome they contemplated

and accepted. Moreover, they cannot have sustained any "diminution in value" damages as a result of the shares merely being returned to Martin's hands; Martin was free to vote her shares in whatever way she wanted before the transfer, and she is free to do the same after the transfer is voided. And the Higginson Parties' contention that the "reversion back" to Martin resulted in a "loss of opportunity to obtain majority control" (Br. at 22) is doubly flawed -- first, they did not have majority control before the "reversion" and nothing would change after the reversion; and second (as discussed next in detail), they never requested any "loss of opportunity" damages from the arbitrators, who therefore would have exceeded their powers if they had made any such award.[5]

***"Authority to Award Damages for Loss of Shares"***: Next, relying on the language of section 9.2 giving the parties "any other remedies available to them at law or in equity," the Higginson Parties contend that the arbitrators could have awarded them damages caused by Martin's "failure to timely delivery the shares to

---

[5] For similar reasons, there is no merit to the Higginson Parties' conclusory and unsupported suggestion that the arbitrators' award could have compensated them for the "unjust enrichment" of Martin. (Br. at 10, 20, 39) The arbitrators did not base their damages award on a claim for unjust enrichment, nor could they have done so without exceeding their powers. Unjust enrichment is recoverable in circumstances where there is no contract between the parties, *see, e.g., Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000), but the Higginson Parties' arbitration claim was based solely on breach of contract. (4 RR at PX 5; DX E) Moreover, the arbitrators' damages award was well in excess of the maximum amount the Higginson Parties sought for unjust enrichment (4 RR at PX 5, ¶ 48; PX 21, p. 3), and also included an award of legal fees that is ordinarily not available for unjust enrichment claims. Thus, the Higginson Parties' unjust enrichment theory does not, and could not, support the arbitrators' award.

[them] upon their acceptance under the right of first refusal." (Br. at 23) Although such a remedy is not legally *available* for the reasons discussed below on page 32, the more immediate problem with the Higginson Parties' theory is that they never sought or proved any damages resulting from the lost opportunity to obtain Martin's shares "under the right of first refusal." (Br. at 23) Thus, the arbitrators would have exceeded their powers if they had actually done what the Higginson Parties now suggest.

As the arbitrators confirmed in an October 13, 2014 order, the Higginson Parties were "bound in this proceeding . . . to the representation made in paragraph 44" of their arbitration petition, in which they sought damages from only one claimed breach of the Shareholders' Agreement -- Martin's act of transferring her shares to the Byrnes. (4 RR at DX E; PX 5, ¶¶ 43-44) Nowhere in their arbitration pleadings did the Higginson Parties seek "benefit of the bargain" or "lost opportunity" damages from not being able to exercise their "right of first refusal." (4 RR at PX 5) Nor did their expert offer any opinions relating to such purported damages. (4 RR at PX 21) And the reason the Higginson Parties did not seek such damages is obvious: they would have had to pay Martin (or offset against any recovery from Martin) the same $3,130,000 that the Byrnes had paid for Martin's shares. Because the Higginson Parties did not seek such a remedy -- even assuming

it was otherwise available under the Shareholders' Agreement and the law -- the arbitrators would have exceeded their powers had they awarded it.

Contrary to the Higginson Parties' suggestion, the Dallas Court of Appeals' opinion in *Centex/Vestal v. Friendship West Baptist Church*, 314 S.W.3d 677 (Tex. App. -- Dallas 2010, pet. denied), does not support their argument that the arbitrators had the power to award damages arising from Martin's purported stock transfer. (Br. at 24-25) In *Centex/Vestal*, the court held that the arbitrator did not exceed his power in requiring the owner of a construction project to pay damages to a contractor's subcontractor and sub-subcontractor because: (1) the arbitration clause broadly covered disputes involving those entities, and (2) the parties asked the arbitrator to determine whether the law allowed the contractor to pursue the "pass-through" claims of those entities. *Id*. at 685-86. In this case, by contrast, the Shareholders' Agreement limited the available remedy to the voiding of the breaching stock transfer; the Higginson Parties only sought damages resulting from a transfer they had previously agreed was void (and thus never occurred); and Martin never agreed to the submission of any other damages theory to the arbitrators. Thus, the arbitrators exceeded their powers by awarding damages for a purported transfer the parties agreed would be remedied only by voiding it, and they would have exceeded

29

their powers if they had awarded damages based on some other theory that was never arbitrated.[6]

If any legal authority applies to the Higginson Parties' present "loss of opportunity" argument, it is *Totem Marine Tug & Barge, Inc. v. North American Towing, Inc.*, 607 F.2d 649 (5th Cir. 1979). There, the owner of a vessel submitted to the arbitrators an "itemized statement" of the damages it was seeking from a charterer of its vessel, identifying the expenses of returning the vessel as its largest item of damages. *Id*. at 650. The arbitrators, however, awarded the vessel owner a larger sum for a different item, which consisted of "damages for charter hire." *Id*. Noting that "[a]rbitration is contractual and arbitrators derive their authority from the scope of the contractual agreement," the Fifth Circuit held that "[t]he arbitration panel exceeded its powers by awarding damages for charter hire" when the vessel owner had "fail[ed] to list charter hire in its itemized statement of damages." *Id*. at 651. So too here: if the arbitrators had attempted to award damages for Martin's "failure to timely deliver the shares to Appellants upon their acceptance under the

---

[6] This case is distinguishable from *Centex/Vestal* in another significant respect. There, the court of appeals noted that the owner's argument -- to the effect that "pass-through" claims were prohibited by Texas law -- was "couched in terms of whether the arbitrator exceeded his authority" but was "really a complaint that the arbitrator committed an error of law." 314 S.W.3d at 686. Here, by contrast, Martin's challenge to the arbitrators' award is based *not* on a claimed error of law but on the parties' agreement, which limited the remedy for a breaching stock transfer to voiding the transfer and returning the shares to the transferor. Unlike the arbitrator in *Centex/Vestal*, the arbitrators here exceeded the authority conferred on them by disregarding the parties' contractual remedy and awarding damages instead.

right of first refusal" -- as the Higginson Parties now suggest (Br. at 23) -- the arbitrators would have exceeded their powers because the Higginson Parties never asserted any such theory of damages or designated an expert on such a theory.

*"Agreement Anticipates Damages for Attempted Transfer"*:  In yet another example of revisionism, the Higginson Parties note that section 9.2 forbids an "attempted or threatened breach," and assert that the arbitrators could have awarded them damages for the "benefit" of "not obtain[ing] what they bargained for -- timely delivery of the shares" pursuant to their right of first refusal.  (Br. at 25-26)  Again, this argument is inconsistent with the Shareholders' Agreement, their own arbitration submission, and the law.

To begin with, the Higginson Parties did not seek to arbitrate any "attempted or threatened breach"; rather, they argued that Martin had *actually* breached the Shareholders' Agreement by transferring her shares to the Byrnes.  (4 RR at PX 5) But under section 9.2, voiding the transfer is the exclusive remedy for such a breach, and damages therefore are not "available" under section 9.2 as a matter of law or logic.  And as previously discussed, the Higginson Parties did not seek or prove any "benefit of the bargain" damages resulting from not obtaining Martin's shares under the right of first refusal.  Accordingly, the arbitrators would have exceeded their powers if they had awarded such unrequested and unproven damages.  *Totem Marine*, 607 F.2d at 651.

Moreover, although this Court need not address the Higginson Parties' discussion of what "Texas law mandates" with respect to a right of first refusal (Br. at 25-26), it is worth nothing that their legal argument is incorrect in any event. Citing to *Abraham Investment Co. v. Payne Ranch, Inc.*, 968 S.W.2d 518 (Tex. App. -- Amarillo 1998, pet. denied), the Higginson Parties assert that once they "stated their intention to match [the Byrnes'] offer, it was a requirement of the Shareholders' Agreement for [Martin] to deliver the shares" to the Higginson Parties because "the offer becomes an irrevocable option." (Br. at 25-26) What *Abraham* actually holds, however, is that "[t]he terms of that option are formed by the provisions granting the preferential right [of first refusal] *and* by the provisions within the notice-of-intent-to-sell given to the rightholder." 968 S.W.2d at 524-25 (emphasis added). Here, the notice-of-intent-to-sell that Martin sent to the Higginson Parties specifically advised them of the Byrnes' offer *and* her conditional acceptance of it, including her right to withdraw from the transaction at any time before closing and receipt of payment. (4 RR at PX 41, 42) Because the Higginson Parties' option necessarily included the same right on the part of Martin to withdraw from any transaction with them, the Higginson Parties would not have been able to prove any compensable "bargain" from such an option -- even if they had tried to do so in the arbitration.

***"Damage Question to Arbitration Panel"*:** Finally, in another variation of their same theme, the Higginson Parties argue that section 9.2 contemplated an award of damages because it provided for specific performance or injunctive relief "in addition to any other remedies available to them at law or in equity." (Br. at 26-27, citing 1 CR 32) But as previously discussed, damages from a breaching stock transfer cannot possibly be "available," as a matter of law or logic, when the parties have previously agreed that the sole remedy for any such transfer is to treat it as void and inoperative.

Equally erroneous is the Higginson Parties' related contention that Martin somehow made a "concession" that the arbitrators were "authorized to award damages" when she filed a motion to limit the Higginson Parties' remedies. (Br. at 27-28, citing 4 RR at DX C, pp. 4-5) Nothing can be further from the truth. As Martin's counsel testified at the August 25 hearing, and as Martin's motion to limit makes clear, Martin was only attempting to lock the Higginson Parties into a damages remedy that Martin contended was unavailable to them. (3 RR 58-59; 4 RR at DX C) Importantly, Martin never "conceded" that the Higginsons were entitled to recover such damages or that the arbitrators were authorized to award them. To the contrary, in both her answering statement (filed before her motion to limit) and her dispositive motion (filed after her motion to limit), Martin made clear that the Higginson Parties were not entitled to recover damages for a transfer they

33

agreed is void, and that the arbitrators had no authority to award any such damages. (4 RR at DX B, pp. 5-6; DX F, pp. 6-13)  There is simply no evidence that Martin ever waived or agreed to modify the exclusive remedy provided in section 9.2 for a breaching stock transfer.

For all these reasons, the Higginson Parties' arguments on pages 20-28 should be rejected, and the trial court's order vacating the arbitrators' award as an excess of power should be affirmed.

## III. The Trial Court Correctly Vacated the Arbitration Award Because the Arbitrators Exceeded Their Powers by Refusing to Accept the Parties' Settlement Agreement that Would Have Ended Their Dispute.

Arbitrators derive their powers not only from the parties' pre-dispute arbitration agreements, but also from any agreements the parties may make during the course of the arbitration itself.  *See, e.g., Bakers Union Factory No. 326 v. ITT Continental Baking Company, Inc.*, 749 F.2d 350, 354-56 (6th Cir. 1984).  Thus, even if the Shareholders' Agreement had not limited the remedy the arbitrators could impose for a breaching stock transfer, the settlement agreement that the parties submitted to the arbitrators on February 5, 2015 had precisely the same effect.  By refusing to accept the settlement agreement and instead forcing the parties to proceed to a hearing where the arbitrators awarded a different remedy from what the parties had agreed to accept, the arbitrators exceeded their powers for this additional reason. Although the Higginson Parties try to challenge the validity of the settlement

agreement (Br. at 28-33), their arguments cannot withstand scrutiny. And their attacks on the trial court's evidentiary rulings relating to the settlement (*id*. at 33-35) are also without merit.

**A.  Once the Parties Agreed to Settle Their Dispute, the Arbitrators Had No Power to Require Further Proceedings or to Award Damages.**

After the arbitration commenced, Martin and the Higginson Parties settled their dispute and sent the AAA administrator and arbitrators an "Arbitration Award approved as to form by the attorneys of record." (3 RR 30-32, 41; 4 RR at PX 11; 2 CR 1730) The parties' settlement agreement, as reflected in this Arbitration Award, largely tracked the Shareholders' Agreement and the remedy in section 9.2 by providing that: (1) the Shareholders' Agreement "is valid and enforceable"; (2) Martin breached the Shareholders' Agreement by not selling her shares to the Higginson Parties; (3) her transfer of shares to the Byrnes "is void"; and (4) the Higginson Parties would be entitled to specific performance because they "do not have a monetary damage remedy against [Martin] for breach of the Shareholder Agreement." (4 RR at PX 11) The parties' settlement agreement also provided that Martin would pay the total amount of $400,000, which would be allocated to the AAA's fees and the arbitrators' fees (once those amounts were determined), with the remaining amount going to the Higginson Parties for their attorney's fees. (*Id*.)

Under basic principles of contract law, this settlement agreement had the effect of superseding the parties' previous agreements and submissions relating to the arbitration. *See, e.g., Flanagan v. Martin*, 880 S.W.2d 863, 867 (Tex. App. -- Waco 1994, writ dism'd w.o.j.) (parties' mutual agreement to accept new contract had the effect of extinguishing their old contract). Upon receiving the settlement agreement, the arbitrators had to do no more than fill in the amounts of their fees and the AAA's fees, sign the Arbitration Award, and end the dispute between Martin and the Higginson Parties. (3 RR 33, 36-37, 41, 62) Although the settlement agreement thus relieved the arbitrators of any further authority to adjudicate the dispute, they refused to accept the agreement and instead forced a hearing and issued an award vastly different from what the parties had agreed to accept. (4 RR at PX 2, PX 13) By proceeding in this manner, the arbitrators usurped the parties' right to settle their own disputes and thereby "exceeded their powers" under section 171.088(a)(3)(A).

The rationale for vacating an arbitration award in these circumstances was clearly and succinctly explained in *Bakers Union Factory No. 326 v. ITT Continental Baking Company, Inc.*, 749 F.2d 350 (6th Cir. 1984). There, an employer and union resolved a grievance by agreeing to reinstate the employee subject to dismissal if he failed to comply with certain conditions. *Id*. at 351. When the employee later failed to comply and was dismissed, the union filed another grievance and an arbitrator

ordered the employer to reinstate the employee. *Id*. at 351-52. Faced with the question whether "the arbitrator ha[d] the authority to disregard the explicit terms of the prior settlement agreement reached by the parties," the Sixth Circuit held he did not and instructed the district court "to vacate the award of the arbitrator." *Id*. at 353, 356.

In language that fully applies to the present case, the Sixth Circuit reasoned that courts must not "defer" to arbitrators' decisions that improperly "override" the parties' settlement agreements:

> Our tradition of deference to arbitral decisions is not based on a solicitude for arbitrators. That tradition is based on our desire to give effect to the parties' chosen means of dispute resolution. When a party claims that the chosen means of dispute resolution is private settlement, we have no reason to defer to the arbitrator's decision. Therefore, we will not defer to the arbitrator's determination of his or her authority to override the terms of a settlement agreement in that narrow category of cases in which a party claims that the chosen means of dispute resolution is private settlement rather than arbitration.

*Id*. at 354. The court further held that "even if the settlement agreement is not final and binding in the sense that it can be enforced in federal court without first having been submitted to an arbitrator, the settlement agreement still is binding on the arbitrator." *Id*. at 355.[7]

---

[7] *See also Cooper Natural Resources, Inc. v. Int'l Union of Operating Engineers, Local 351*, No. 4:97-CV-669-A, 1998 WL 25547, at *3 (N.D. Tex. Jan. 12, 1998) (arbitrator exceeded his authority by ignoring the parties' agreement to settle their disputes); 97 AM. JUR. TRIALS, *Arbitrator Selection and Service* § 121 (2005) ("if there is a direct settlement by the parties of

37

Based on the reasoning of *Bakers Union*, the trial court in this case was correct in refusing to defer to the arbitrators' award of damages because it was issued in disregard of the parties' chosen means of settling their dispute and ending the arbitration. When the parties asked the arbitrators to simply fill in the amounts of the arbitration fees and sign the Arbitration Award, the arbitrators were deprived of any power to insist on further proceedings, to incur more fees, and to ultimately issue a vastly different award from what the parties had agreed to in their settlement. Indeed, if the court below had done anything *other* than vacate the arbitrators' award in these circumstances, it would have "undermine[d] the validity of a system that seeks to encourage settlements reached without the aid of an arbitrator." *Bakers Union*, 749 F.2d at 354. For this additional reason, the trial court's order vacating the arbitrators' award was correct and should be affirmed in its entirety.

**B.    Contrary to the Higginson Parties' Arguments, the Parties' Settlement Agreement Was Enforceable and Binding on the Arbitrators.**

The Higginson Parties do not deny that the parties settled their dispute on the terms reflected in the Arbitration Award sent to the AAA and the arbitrators, and they do not try to justify the arbitrators' refusal to accept the parties' settlement agreement. Instead, they attempt to avoid the effect of the settlement agreement

_____

some or all issues in a case, regardless of what stage in the proceedings that may occur, the arbitrator is relieved of further jurisdiction over such issues").

38

based on certain "implications" they draw from the "AAA Rules" and from "Rule 11" of the Texas Rules of Civil Procedure. (Br. at 29-33) The Higginson Parties' reliance on these two rules is misplaced because neither overrides the statutory provision, as interpreted by the courts, forbidding arbitrators from exceeding their powers by disregarding parties' settlement agreements.

Contrary to the Higginson Parties' first argument (Br. at 29-30), Rule 48 of the AAA Commercial Rules cannot be read to excuse the arbitrators' refusal to accept the parties' settlement agreement. Rule 48 provides that "[i]f the parties settle their dispute during the course of the arbitration and if the parties so request, the arbitrator may set forth the terms of the settlement in a 'consent award.'" *See* AAA COMM. R. 48. Although the rule's use of the word "may" arguably gives the arbitrators discretion in the precise manner by which they "set forth the terms of the settlement," the rule cannot be interpreted to allow arbitrators to outright *ignore* the parties' settlement agreement. *See* 97 AM. JUR. TRIALS, *Arbitrator Selection and Service* § 121 ("While the arbitrator *may* adopt such a consent award, to be clear, an arbitrator *must* adopt a consent award as a matter of contractual arbitrability if all terms of the award are proper, fair, sound, and lawful.") (emphasis in original). Tellingly, the Higginson Parties cite no case holding that Rule 48 overrides the legal

principles requiring arbitrators to give effect to the parties' chosen means of resolving their disputes.[8]

The Higginson Parties are also wrong in suggesting that the Arbitration Award presented to the arbitrators was "not binding or enforceable" because the arbitrators did not sign it. (Br. at 30) This argument is entirely circular, and conflates the distinction between a settlement agreement reached in arbitration that is binding on a court and one that is binding on the arbitrators. Thus, as the court explained in *Bakers Union*, "even if the settlement agreement is not final and binding in the sense that it can be enforced in federal court without first having been submitted to an arbitrator, *the settlement agreement still is binding on the arbitrator*." 749 F.2d at 355 (emphasis added).

Equally without merit is the Higginson Parties' argument that the parties' settlement agreement "is not a Rule 11 Agreement as a matter of law." (Br. at 30) As a threshold matter, the Higginson Parties cite no case holding that a settlement agreement in an arbitration proceeding must comply with TEX. R. CIV. P. 11 before

---

[8] The one case the Higginson Parties do cite -- *Seals v. Herzing Inc.-New Orleans*, 482 Fed. Appx. 893 (5th Cir. June 29, 2012) -- is inapposite. There, the court described the method by which the settlement agreement was reached and recorded in the arbitration hearing, but it had no occasion to decide, and did not hold, that this method was necessary or required for an enforceable settlement in an arbitration proceeding. The Higginson Parties' reference to AAA Commercial Rule 47 is also unavailing. (Br. at 29) If anything, Rule 47 undermines their argument because it provides that "any remedy or relief" granted by an arbitrator must be "within the scope of the agreement of the parties." AAA COMM. R. 47(a).

it can be binding on an arbitrator. The plain language of Rule 11 suggests otherwise, because a settlement agreement made in an arbitration proceeding is not "touching on any *suit pending*." TEX. R. CIV. P. 11 (emphasis added). Nor is it something that needs to "be enforced" by a court. *Id*.

In any event, even if Rule 11 applied in this context, the parties' settlement agreement satisfied all the requirements of Rule 11. Contrary to the Higginson Parties' first contention, the agreement had no "missing terms" -- whether material or not -- merely because it contained two blanks. (Br. at 31) As the settlement agreement makes clear, Martin agreed to pay a total of $400,000 allocated between the AAA's fees, the arbitrators' fees, and the Higginson Parties' attorney's fees, and even though the parties did not yet know the first two amounts, the Higginson Parties agreed that they would accept whatever amount was left up to a cap of $400,000. (4 RR at PX 11) All essential terms were accounted for and agreed to. *See, e.g., Disney v. Gollan*, 233 S.W.3d 591, 596 (Tex. App. -- Dallas 2007, no pet.) (Rule 11 settlement agreement contained all essential terms, despite need for "parol evidence" to "clarify" certain terms about the permissible deductions from payments).

Moreover, there are no "missing signatures," as the Higginson Parties state. (Br. at 31-32) The Arbitration Award was signed by both the attorney for the Higginson Parties and the attorney for Martin (4 RR at PX 11), and their signatures are binding on the parties as a matter of law. *See Padilla v. LaFrance*, 907 S.W.2d

41

454, 460-61 (Tex. 1995) (enforcing Rule 11 settlement agreement based on series of letters between plaintiff's attorney and adjuster for defendant's insurer). And even though the settlement agreement was "approved only as to form" (4 RR at PX 11), Rule 11 neither forbids agreements when they are approved only as to form nor requires agreements to be approved as to both form and substance. Indeed, Martin's counsel testified that the agreement was approved as to form "so that we could get it submitted to settle the dispute," and that the only reason he did not approve it as to substance was because he knew Martin would answer "no" if she were "asked in subsequent proceedings whether she agreed that she breached" the Shareholders' Agreement. (3 RR 44) Under Rule 11, that reservation had no effect on the binding nature of the settlement agreement on the arbitrators.

Finally, the Higginson Parties' contention that the settlement agreement was "not filed" and therefore unenforceable (Br. at 32-33) is contrary to both the law and the evidence. Like the defendants in *Padilla*, the Higginson Parties "confuse the requirements for an agreed judgment with those for an enforceable settlement agreement." 907 S.W.2d at 461. While the former must be approved at the time it is rendered, the latter is enforceable under Rule 11 as long as it is filed at any time "before it is sought to be enforced." *Id.* Martin indisputably met that requirement when she filed the settlement agreement as an attachment to her amended motion to vacate the arbitration award. (2 CR 1799-1802) And the Higginson Parties'

42

contention that the agreement "was not filed of record before the Panel" (Br. at 32) is flat wrong. Rule 43 of the AAA Commercial Rules provides that "notice and communications" are to be served by e-mail on the parties and the arbitrators, and that is precisely what the Higginson Parties' counsel did with the settlement agreement. (4 RR at PX 11) The agreement is therefore enforceable under Rule 11, even assuming compliance with Rule 11 were necessary to make it binding on the arbitrators.[9]

## C.    The Trial Court Properly Handled the Settlement Issue.

In one paragraph devoid of any legal authority, the Higginson Parties suggest that the trial court must not have found "any valid settlement agreement" -- and therefore "could not have found the Panel exceeded their authority" -- because the court vacated the award rather than "modifying it or compelling the parties back to arbitration." (Br. at 33-34) This argument is a *non sequitur*. Like the court in *Bakers Union*, the court below properly vacated the arbitration award, and it was entitled to do so based on the evidence of a "settlement agreement [that] is binding on the arbitrators." 749 F.2d at 355-56. But because the settlement agreement had not been

---

[9] The Higginson Parties also misstate the evidence in arguing that Martin's counsel "admitted that no settlement agreement existed and requested the matter proceed to final hearing by the Panel." (Br. at 33) In fact, Martin's counsel believed that the parties had an agreement that would settle their dispute and end the arbitration, and he requested that the case proceed to hearing only *after* the arbitrators refused to accept the settlement agreement and demanded changes that Martin was unwilling to make. (3 RR 33, 41, 55-56, 62; 4 RR at PX 13)

signed by the arbitrators, the trial court could not enforce it by either modifying the award or sending the parties back to arbitration. *Id*. at 355. Nor did it need to do so under the authority of *Bakers Union* and section 171.088(a)(3)(A).

The Higginson Parties also miss the mark with their additional argument that the trial court abused its discretion in admitting "evidence and testimony regarding settlement discussions." (Br. at 34-35) As a preliminary matter, the Higginson Parties inaccurately describe the trial court's evidentiary rulings. The court did not, for example, permit Martin's counsel "to discuss settlement negotiations" (Br. at 34); in fact, the court specifically *prohibited* Martin's counsel from testifying about settlement discussions or negotiations (3 RR 28). And while the Higginson Parties now object to the "admissibility of Exhibits 1, 10-14, 21-22" (Br. at 35), exhibits 1, 12, and 22 were not admitted (3 RR 4); exhibits 10 and 21 do not relate to the settlement issue at all (*id*.); and exhibits 13 and 14 are post-settlement emails that the Higginson Parties are now relying on for their arguments on appeal (Br. at 33).

That leaves exhibit 11 -- the Arbitration Award approved by the parties' counsel and sent to the arbitrators -- and the trial court's admission of that exhibit is not precluded by TEX. CIV. PRAC. & REM. CODE § 154.073, as the Higginson Parties now allege. (Br. at 34-35) To the contrary, section 154.073(c) specifically provides that a court can admit written materials used in an ADR proceeding if they are "admissible . . . independent of the [ADR] proceeding." That is precisely the case

44

here, where the trial court admitted exhibit 11 in a hearing on the Higginson Parties' petition to confirm and Martin's motion to vacate the arbitration award -- a hearing that was plainly "independent" of the arbitration proceeding itself. And no other rule of evidence or procedure barred the trial court from admitting exhibit 11 for the limited purpose of determining whether the arbitrators exceeded their powers by rejecting the settlement agreement and issuing a different award. *See* TEX. R. EVID. 408 (settlement agreement not subject to exclusion when it is offered for a purpose other than proving "liability for or invalidity of [a] claim or the amount"). The trial court thus committed no error, let alone *reversible* error, in admitting exhibit 11 and hearing the limited testimony of Martin's counsel. TEX. R. APP. P. 44.1.

## IV. The Trial Court Correctly Denied the Higginson Parties' Petition to Confirm the Arbitration Award.

Because the trial court was correct in granting Martin's motion to vacate the arbitrators' award under the statutory "exceeding their powers" ground, it necessarily follows that the court was also correct in denying the Higginson Parties' petition to confirm the arbitration award. But in a final effort to avoid this result, the Higginson Parties urge that their petition to confirm was based on both the TAA and the FAA, that Martin did not seek to vacate the award under the FAA, and that the trial court therefore "erred in vacating the Award under the Federal Act and failing to confirm the Award as no pleadings exist to support same." (Br. at 36-38) Putting aside the fact that the trial court did *not* "vacat[e] the Award under the Federal

45

Act" -- the September 1 order did not specify which statute the court was applying -- the Higginson Parties' argument is wrong as a matter of procedure and substance.

From a procedural standpoint, the Higginson Parties overlook the fact that the Shareholders' Agreement -- which formed the basis of the parties' dispute and contained the arbitration clause -- specifically provides that "[a]ll questions concerning the construction, validity, and interpretation of this Agreement, including the relative rights of the Corporation and the Shareholders, are governed by and construed *in accordance with the laws of the state of Texas*." (4 RR at PX 3, § 9.3) (emphasis added) The "laws of the state of Texas" obviously include the TAA. And even if this valid choice-of-law provision did not exist, the Higginson Parties had the burden of proving that the Shareholders' Agreement had a "substantial effect on interstate commerce," as is required for the FAA to apply. *See Russ Berrie and Co., Inc. v. Gantt*, 998 S.W.2d 713, 715 (Tex. App. -- El Paso 1999, no pet.). But when Martin pointed this out at the August 25 hearing on the petition to confirm and motion to vacate, the Higginson Parties did no more than offer into evidence seven exhibits, none of which established that the dispute under the Shareholders' Agreement involved anything more than the transfer of stock in a Texas corporation from one Texas resident to another Texas resident. (3 RR 4-5, 10, 13-14) Thus,

based on either the choice-of-law provision or the evidentiary record, the Higginson Parties failed to prove that the FAA governs this case.

In any event, it makes no difference as a substantive matter whether the TAA or the FAA applies. Using identical language, both the TAA and the FAA authorize a trial court to vacate an arbitration award where "the arbitrators exceeded their powers." TEX. CIV. PRAC. & REM. CODE § 171.088(a)(3)(A); 9 U.S.C. § 10(a)(4). As the discussion above in parts II and III demonstrate, state and federal courts apply the same principles under both the TAA and FAA in determining whether arbitrators have "exceeded their powers." Indeed, Martin's amended motion to vacate the arbitration award specifically noted that the FAA "has a like provision" to section 171.088(a)(3)(A), and throughout her motion, she cited and discussed cases applying section 10(a)(4) of the FAA. (2 CR 1726 & n.16 - 1731) Accordingly, even if the trial court had applied the FAA in vacating the arbitration award, it would have been correct in doing so.

## PRAYER

For the reasons stated above, Appellee Raeanne Martin respectfully prays that the Court affirm the trial court's September 1, 2015 order granting her motion to vacate the arbitration award and denying the Higginson Parties' motion to confirm it. Martin requests such other relief to which she is entitled.

Respectfully submitted,

*/s/ Jeffrey S. Levinger*

| | |
|---|---|
| **G. Michael Gruber** | **Jeffrey S. Levinger** |
| State Bar No. 08555400 | State Bar No. 12258300 |
| Email: mgruber@ghetrial.com | Email: jlevinger@levingerpc.com |
| **Michael J. Lang** | **Levinger PC** |
| State Bar No. 24036944 | 1445 Ross Avenue, Suite 2500 |
| Email: mlang@ghetrial.com | Dallas, Texas 75202 |
| **Priya A. Bhaskar** | Telephone: 214-855-6817 |
| State Bar No. 24082690 | Facsimile: 214-855-6808 |
| Email: pbhaskar@ghetrial.com | |
| **Gruber Hurst Elrod Johansen Hail Shank LLP** | **Terry Scarborough** |
| 1445 Ross Avenue, Suite 2500 | State Bar No. 17716000 |
| Dallas, Texas 75202 | Email: tscarborough@hslawmail.com |
| Telephone: 214-855-6800 | **Hance Scarborough, L.L.P.** |
| Facsimile: 214-855-6808 | 400 West 15th Street, Suite 950 |
| | Austin, Texas 78701 |
| | Telephone: 512-479-8888 |
| | Facsimile: 512-479-6891 |

*Attorneys for Appellee*

### CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of TEX. R. APP. P. 9.4(i)(2)(B) because it contains 12,234 words, excluding the parts of the brief exempted by TEX. R. APP. P. 9.4(i)(1).

2.      This brief complies with the typeface requirements of TEX. R. APP. P. 9.4(e) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14 point Times New Roman font (and 12 point for footnotes).

*/s/ Jeffrey S. Levinger*

**Jeffrey S. Levinger**

**CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of this Appellee's Brief was served via the Court's electronic filing system on the following Appellants' counsel on this 18th day of December, 2015.

Anna McKim
J. Paul Manning
Field, Manning, Stone,
Hawthorne, and Aycock, P.C.
2112 Indiana Ave.
Lubbock, Texas 79410

*/s/ Jeffrey S. Levinger*

**Jeffrey S. Levinger**

**APPENDIX**

Order Granting Amended Motion to Vacate Arbitration Award
and Denying Petition to Confirm and Enforce Award of
Arbitrators, signed on September 1, 2015 (2 CR 1909-11)................................tab 1

Shareholders' Agreement between Certain Shareholders of
Russell E. Womack, Inc., dated January 1, 2008 (4 RR at PX 3) .......................tab 2

Plaintiffs' First Amended Original Petition in Arbitration,
dated October 1, 2014 (4 RR at PX 5)...............................................................tab 3

February 5, 2015 email attaching Arbitration Award
(4 RR at PX 11)..................................................................................................tab 4

Amended Motion to Vacate or Modify Arbitration Award,
filed August 19, 2015 (2 CR 1720-33) ..............................................................tab 5

# TAB 1

CAUSE NO. 2013-506,513

RHR

| | | |
|---|---|---|
| RAEANNE MARTIN, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| v. | § | |
| | § | |
| NANCY HIGGINSON; DEBBIE | § | |
| CHEADLE; EDWARD CHEADLE; | § | |
| ARTHUR CHEADLE; WAYNE | § | |
| CARSON; FINNEY CHEADLE; | § | |
| CHERYL SHOOP; KEITH SAWAYA; | § | |
| MICHAEL V. BYRNE; RICHARD | § | |
| BYRNE; JIM BYRNE, Jr.; BARBARA | § | 72nd JUDICIAL DISTRICT |
| HOLLADAY; WEST WOMACK; and | § | |
| CAROLYN VICTORIA CAIN | § | |
| IRREVOCABLE TRUST, | § | |
| | § | |
| *Defendants and Cross-Plaintiffs,* | § | |
| | § | |
| v. | § | |
| | § | |
| MICHAEL BYRNE AND | § | |
| RICHARD BYRNE, | § | |
| | § | |
| *Cross-Defendants.* | § | LUBBOCK COUNTY, TEXAS |

**ORDER GRANTING AMENDED MOTION TO VACATE ARBITRATION AWARD AND DENYING PETITION TO CONFIRM AND ENFORCE AWARD OF ARBITRATORS**

On August 25, 2015, the Court heard and considered Plaintiff Raeanne Martin's ("Plaintiff") *Amended Motion to Vacate or Modify Arbitration Award* ("Motion to Vacate") and Counter-Plaintiffs Nancy Higginson, Debbie Cheadle, Edward Cheadle, Arthur Cheadle, Wayne Carson, Finney Cheadle, Cheryl Shoop, and Keith Sawaya's ("Counter-Plaintiffs") *Petition to Confirm and Enforce Award of Arbitrators* ("Petition to Confirm"). Upon consideration of the Motion to Vacate, the Petition to Confirm, any responses or replies thereto, the pleadings on file, the record, the evidence, and the arguments of counsel, the Court is of the opinion that Plaintiff's

SCANNED

1909

Motion to Vacate should be and hereby is **GRANTED** and that Counter-Plaintiffs' Petition to Confirm should be and hereby is **DENIED**.

IT IS THEREFORE ORDERED that the Award of Arbitrators is hereby **VACATED**.

IT IS FURTHER ORDERED that Counter-Plaintiffs' Petition to Confirm is **DENIED**.

SIGNED this **1st** day of September 2015.

**/s/ Ruben Reyes**

_____

JUDGE PRESIDING

**APPROVED AS TO FORM:**

*/s/ G. Michael Gruber*
**G. Michael Gruber**
*State Bar No. 08555400*
**Michael J. Lang**
*State Bar No. 24036944*
**Laura M. Fontaine**
*State Bar No. 24065239*
**Priya A. Bhaskar**
*State Bar No. 24082690*
**GRUBER HURST ELROD JOHANSEN HAIL SHANK LLP**
1445 Ross Avenue, Suite 2500
Dallas, Texas 75202
Telephone: (214) 855-6800
Facsimile: (214) 855-6808

*and*

*/s/ Terry Scarborough*
**Terry Scarborough**
*State Bar No. 24050372*
**HANCE SCARBOROUGH, LLP**
400 West 15th Street, Suite 950
Austin, Texas 78701
Telephone: (512) 479-8888
Facsimile: (512) 482-6891

**ATTORNEYS FOR PLAINTIFF**

*/s/ J. Paul Manning*
**J. Paul Manning**
State Bar No. *24002521*
**FIELD, MANNING, STONE, HAWTHORNE & AYCOCK, P.C.**
2112 Indiana Avenue
Lubbock, Texas 79410
Telephone: (806) 792-0810
Facsimile: (806) 792-9148

**ATTORNEY FOR COUNTER-PLAINTIFFS**

# TAB 2

# Shareholders' Agreement

## between

## Certain Shareholders

## of

## Russell E. Womack, Inc.

## January 1, 2008

# Shareholders' Agreement

# Russell E. Womack, Inc.

This Shareholders' Agreement ("Agreement") is entered into effective on the 1st day of January, 2008, by and between the undersigned shareholders of Russell E. Womack, Inc., a Texas corporation ("Corporation"), as listed on the attached Exhibit "A", the spouses of the listed shareholders, and any person who subsequently becomes a party to this Agreement under its terms.

### Article 1
### Nature and Purposes of Agreement

To secure continuity and stability of the policies and the management of the Corporation, as among the shareholders who participate in this Agreement, all parties to this Agreement agree to restrict the transfer of Shares under certain circumstances, to preserve the closely held nature of the Shares owned by the parties to this Agreement, and to establish a plan for the purchase of Shares on a Shareholder's bankruptcy, divorce, or death, the death of a Shareholder's Spouse, or on the imposition of a creditor lien on Shares that are subject to this Agreement.

Therefore, in consideration of the premises and mutual promises contained in this Agreement, the parties agree as follows:

### Article 2
### Defined Terms

As used in this Agreement, the following terms shall have the following meaning, and other terms are defined herein:

"Common Stock" means the common stock, $1.00 par value per share, of the Corporation.

"Immediate Family" means parents, siblings, a spouse during marriage and not incident to divorce, lineal descendants (including those by adoption), spouses of lineal descendants, and a "stepchild" or "stepchildren" of the Shareholder who is a child of the Spouse of the Shareholder at the time of a transfer of shares by the Shareholder that is subject to this Agreement, but only if the Shareholder specifically names such stepchild(ren) as beneficiaries of a trust or under the Shareholder's will or as part of a transfer document, as a person who would share in a distribution of the Shares by reason of Shareholder's transfer of shares subject to this Agreement.

"Involuntary Transfer" means, with respect to any Shares, any Transfer of Shares other than a Voluntary Transfer. Examples of an Involuntary Transfer include an attachment, seizure, or sheriff's sale in connection with the perfection of a judgment lien, sequestration, appointment of a guardian for the estate of a mentally incapacitated individual, the filing of a petition or transfer in bankruptcy, an award of property to a Spouse pursuant to a divorce decree, and a Transfer at Death.

"Offer" is defined in Section 3.3(a) of this Agreement.

"Offer Notice" means, with respect to a proposed Voluntary Transfer to be made by a Shareholder, a written notice provided by the Shareholder of the terms, conditions, and other information relating to the proposed Voluntary Transfer, including (1) the name and address of the Shareholder proposing to make the Voluntary Transfer, (2) the number of Shares the Shareholder owns, (3) the number of Shares the Shareholder proposes to Transfer, (4) a copy of the proposed transferee's offer to purchase, (5) the proposed transferee's name and address, (6) the price per Share the proposed transferee will pay, (7) how the proposed transferee determined the purchase price per Share, (8) the terms and conditions of payment to be made by the proposed transferee, and (9) any other agreements, documents, or instruments relating to the proposed Voluntary Transfer. Notwithstanding the date thereof, no Offer Notice will be effective and time periods set forth in this Agreement will not begin to run until that Offer Notice is deemed given in accordance with Section 8.2 of this Agreement to all parties entitled to receive that Offer Notice.

"Other Shareholders" means, with respect to any event or transaction, all the Shareholders other than the Shareholder or Shareholders who are the subject of the event or transaction.

"Permitted Transferee" means any of the Persons listed in Section 4.1 of this Agreement.

"Person" means an individual, a corporation, a limited liability company, a trust, a partnership, a joint stock association, a business trust, or a government or agency or subdivision thereof.

"Personal Representative" means the executor, administrator, guardian, or conservator of the estate of a Shareholder or a Spouse.

"Pro Rata" means, with respect to any Shareholder, the number of Shares owned by the Shareholder divided by the total number of Shares owned by the Other Shareholders.

"Purchasers" is defined in Section 7.2 of this Agreement.

"Recipient" is defined in Section 3.2 of this Agreement.

"Shareholder" means any Person who is or becomes, at any time, a party to this Agreement pursuant to its terms and owns Shares at that time registered in his or her own name. Shareholder shall not include Shareholder's spouse, unless such spouse owns Shares registered in his or her own name.

"Shares" means issued and outstanding shares of the Common Stock, excluding treasury shares, which are owned at any time by any party to this Agreement. All references to Shares owned by a Shareholder include the community interest, if any, of the Spouse of that Shareholder.
"Spouse" means the spouse of an individual Shareholder.

"Spousal Interest" means any interest in the Shares owned or claimed by a Spouse.

"Successor" means, with respect to any deceased individual who owned any Shares at the time of that individual's death, (1) that deceased individual's heirs or legatees then owning title to that deceased individual's Shares or the deceased individual's Personal Representative, as the case may be; and (2) the deceased individual's surviving Spouse, to the extent that Spouse owns a community interest in the deceased individual's Shares.

"Transfer" when used as a noun means any direct or indirect sale, assignment, gift, devise, pledge, hypothecation, or other encumbrance or any other disposition of Shares (or any interest in or voting power of Shares) either voluntarily or by operation of law. "Transfer" when used as a verb means the act of directly or indirectly selling, assigning, granting by gift, devising, pledging, hypothecating, or otherwise encumbering or disposing of Shares (or any interest in or voting power of Shares) either voluntarily or by operation of law. In connection with the use of the term "Transfer," the following terms will have the meanings indicated below:

"Transfer at Death" means, with respect to any Shares owned by an individual, the Transfer of those Shares to that individual's heirs, devisees, or legatees at the time of the death of the individual, whether the Shares pass by the laws of intestate succession, the terms of a last will and testament, or pursuant to the marital property laws of any state.

"Transfer by Gift" means, with respect to any Shares, a Voluntary Transfer of all or any portion of the transferor's interest in those Shares to or for the benefit of a charitable organization or a natural object of the transferor's bounty for less than adequate consideration, but specifically excluding any Transfer at Death.

"Voluntary Transfer" means, with respect to any Shares, a Transfer of any interest in those Shares by the free and voluntary act of the transferor (other than a Transfer of Shares resulting from the filing of a petition in bankruptcy), Transfers by Gift, Transfers by sales, and voluntary pledges.

## Article 3
## Transfer Restrictions Generally

3.1  Shareholder Agreement.  Each Shareholder and Spouse agree not to Transfer or permit to be Transferred all or any portion of the Shares now owned or subsequently acquired except in accordance with and subject to the terms and conditions of this Agreement.

3.2  New Shareholders.  Notwithstanding any other provision of this Agreement, no Shares may be Transferred to any Person who is not a party to this Agreement. As a condition precedent to the acquisition of Shares by any Person (a "Recipient") by Transfer from a Shareholder, the Recipient and, if applicable, the Recipient's spouse, shall sign an adoption agreement in substantially the same form attached hereto as Exhibit B pursuant to which the Recipient and the Recipient's spouse agree to be bound by this Agreement. By signing the adoption agreement, the Recipient and the Recipient's spouse agree for themselves and for their respective successors, successors in interest, heirs, legatees, devisees, and legal representatives to be bound by the terms and conditions of this Agreement. On execution of the adoption

agreement, the Recipient and the Recipient's spouse will become a "Shareholder" and a "Spouse" for all purposes of this Agreement. The adoption agreement shall be delivered by the Recipient to the Corporation and all Shareholders who are parties to this Agreement.

3.3     Voluntary Transfer Restrictions.    Any proposed Voluntary Transfer of any Shares by a Shareholder is subject to the following provisions:

(a)     Before the Voluntary Transfer, the Shareholder must send an Offer Notice to the Other Shareholders who are parties to this Agreement describing the Voluntary Transfer (the "Offer"). If any term of the proposed Voluntary Transfer changes after the delivery of an Offer Notice, the Shareholder must promptly notify the Other Shareholders who are parties to this Agreement of the changes, and the subsequent notice will constitute a new Offer Notice for purposes of this Section 3.3(a).

(b)     For a period of sixty days after the date of the delivery of the Offer Notice to the Other Shareholders who are parties to this Agreement, the Other Shareholders have the right to accept or reject the Offer in writing. Each Other Shareholder's response to the Offer must specify the maximum number of Shares that Other Shareholder would be willing to purchase. If any Other Shareholder accepts the Offer, the purchase price shall be a per-Share price equal to the offering price per Share specified in the Offer Notice. The purchase price for the Shares to purchase pursuant to acceptance of the Offer is payable in accordance with Section 7.2 below . If more than one Other Shareholder accepts the Offer, each Other Shareholder who accepts the Offer will be entitled to purchase a portion of Shares being sold equal to a percentage determined by dividing the number of Shares owned by the Other Shareholder by the number of Shares owned by all Other Shareholders who accept the Offer.

(c)     If the Other Shareholders do not accept the Offer to purchase all the Shares that are the subject of the Offer by the expiration of the time periods described in Section 3.3(b) or if before the time periods expire the Other Shareholders reject the Offer in writing, the Shareholder is entitled to sell the remaining Shares strictly in accordance with the terms contained in the Offer Notice.

3.4     Transfer by Pledge.    No Shares may be pledged or otherwise voluntarily encumbered by any Shareholder unless the Other Shareholders approve the pledge by a two-thirds vote of the Other Shareholders. The Other Shareholders have sole discretion to allow Shares to be pledged for any purpose. If, for any reason, any pledged Shares are foreclosed on, the foreclosure will be considered an Involuntary Transfer and the provisions of Section 5.1 below will govern.

3.5     "S" Corporation Restrictions

(a)     The Corporation has elected to be taxed as an "S" corporation under the Internal Revenue Code of 1986, as amended (the "IRC"). Notwithstanding any other provision of this Agreement, unless and until the Corporation effectively terminates its status as an "S" corporation, any attempted Transfer of Shares that would cause the

Corporation to lose its status as an "S" corporation under the IRC is prohibited, and any such Transfer is void.

(b)     If, notwithstanding the restrictions contained in Section 3.5(a), any Shares are effectively made the subject of a Transfer to any Person that would cause the Corporation to lose its status as an "S" corporation or if any change should occur with respect to a Shareholder that would cause the Corporation to lose its status as an "S" corporation, the Other Shareholders have an option exercisable at any time thereafter by providing notice to that Person or that Shareholder to purchase all the Shares owned by that Person or that Shareholder at the purchase price per Share determined pursuant to the provisions of Section 7.1 below, to be payable in accordance with Section 7.2(b).

## Article 4
## Permitted Transfers by Gift

4.1     Permitted Transfers by Gift.  Subject to the provisions of Section 4.2, the provisions of Section 3.3 above do not apply to any Transfer by Gift made by a Shareholder during his life to—

(a)     any member of the Shareholder's Immediate Family, including but not limited to any stepchild of the Shareholder who is specifically named in the gift instrument as a transferee and who is part of the definition of stepchild herein;

(b)     a guardian of the estate of the Shareholder; or

(c)     the trustee of an inter vivos trust for the sole benefit of one or more members of the Shareholder's Immediate Family, provided that the Other Shareholders are notified in writing at least thirty days before the proposed Transfer. The notice must specify (1) the exact name of the trust and its federal tax identification number (or indicate that the number has been applied for but not received) and (2) the name, address, and relationship to the Shareholder of all trustees and beneficiaries of the trust or trusts and their respective federal tax identification or Social Security numbers (or indicate that the numbers have been applied for but not received).

Any transfer to a child who is less than twenty-one years old at the time of the transfer must be conditioned on the Shareholder's retaining the right to do any act with respect to the transferred Shares on behalf of the transferee that is permitted, authorized, or required by this Agreement.

4.2     Permitted Transfer Restrictions.  Before any Transfer of Shares is made under Section 4.1, the Permitted Transferee must become a party to this Agreement in accordance with the provisions of Section 3.2.

4.3     Transfers by Permitted Transferees.  The provisions of Section 3.3 do not apply to any Voluntary Transfer of Shares made by a Permitted Transferee back to the Shareholder who originally made a Transfer by Gift to the Permitted Transferee in accordance with Section 4.1.

4.4 Transfer Restrictions on Gifted Stock. Notwithstanding anything else to the contrary in this Agreement, on any stock transferred by gift by a shareholder under this Article 4, the Shareholder making such transfer shall have the exclusive right to purchase back the stock from the transferee pursuant to the purchase price and terms of Article 7, before any other shareholder has any right to purchase the stock pursuant to the other terms of this Agreement.

**Article 5**
**Notice**

5.1 Involuntary Transfers

(a) If a Shareholder has any notice or knowledge of any attempted, impending, or completed Involuntary Transfer (other than an Involuntary Transfer subject to Article 6 of this Agreement) of any of his Shares, whether by operation of law or otherwise, he must give immediate written notice to the Other Shareholders specifying the number of Shares that are subject to the Involuntary Transfer and all pertinent information in his possession relating to the Involuntary Transfer. If any Shares are ever subject to an Involuntary Transfer (other than pursuant to Article 6 of this Agreement), the Other Shareholders will, at all times thereafter, have the immediate and continuing option by notice to the owner of the Shares within one year after the date the Other Shareholders first learn or have notice of the Involuntary Transfer, to purchase all the Shares for a purchase price per Share determined pursuant to Section 7.1 below to be payable in accordance with Section 7.2(b).

(b) If more than one Shareholder exercises the option, each Shareholder is entitled to purchase that portion of the Shares equal to a percentage determined by dividing the number of Shares owned by the Shareholder by the number of Shares owned by all Shareholders who exercise the option.

5.2 Transfers in Bankruptcy

(a) If a Shareholder or Spouse is the named debtor in bankruptcy or receivership proceedings, the Other Shareholders will, at all times thereafter, have the immediate and continuing option by notice to the bankruptcy or receivership trustee or other applicable party to purchase all the Shares that are the subject of the bankruptcy or receivership proceedings for a purchase price per Share determined pursuant to Section 7.1 to be payable in accordance with Section 7.2(b).

(b) If the Other Shareholders purchase option described in Section 5.2(a) should not be exercised by the Other Shareholders for any reason or is not enforceable by the Other Shareholders for any reason and all or any portion of the Shares subject to the bankruptcy or receivership proceedings are proposed to be made the subject of any kind of Transfer, the Transfer will be deemed to be a Voluntary Transfer by a Shareholder and will be subject to the provisions of Section 3.3.

## Article 6
## Buy-Sell Agreement

6.1    Death of Spouse

(a)    Each Spouse agrees to bequeath his entire Spousal Interest to the Shareholder. This promise is made with Spouse's full knowledge, is made for good and valuable consideration, and constitutes a covenant binding on Spouse's estate, Personal Representative, heirs, and beneficiaries.

(b)    If a Spouse dies and does not leave a valid will admitted to probate bequeathing the entire Spousal Interest to Shareholder or if any will contest is filed by any Person challenging the validity of the bequest of the Spousal Interest to Shareholder, Shareholder and Spouse's Personal Representative must each notify the Other Shareholders. For a period of ninety days following the earliest to occur of (1) the qualification of Spouse's Personal Representative, (2) the entry of an order of the probate court concluding that Spouse's will does not bequeath the entire Spousal Interest to Shareholder, or (3) the filing of a will contest suit, the Shareholder has the exclusive right and option to purchase the Shares at the purchase price per Share determined pursuant to Section 7.1 below to be payable in accordance with Section 7.2(b).

(c)    If the Shareholder does not purchase the entire Spousal Interest in the Shares pursuant to Section 6.1(b) within ninety days, for a period beginning on the first day after expiration of the ninety-day period and ending one year after the entry of a final order by the probate court disposing of the Spousal Interest in the Shares, the Other Shareholders have an exclusive option to purchase all or any portion of the Shares not purchased or awarded to Shareholder at the purchase price per Share determined pursuant to Section 7.1 to be payable in accordance with Section 7.2(b). The Other Shareholder's right to purchase all or any portion of the remaining Shares shall be on a Pro Rata basis or as the Other Shareholders may otherwise agree among themselves.

(d)    If and to the extent that the Other Shareholders do not purchase all of those Shares, each Successor of that Spouse is entitled to require the Corporation to transfer the appropriate portion of the Spouse's Shares to that Successor on the provision that (1) the Successor give to the Corporation and the Other Shareholders documentation as requested by the Corporation or the Other Shareholders to evidence the rightful ownership interest of the Successor in the Spouse's Shares and (2) the Successor becomes a party to this Agreement in accordance with the provisions of Section 3.2 above.

6.2    Death of Shareholder

(a)     Subject to the provisions of Section 6.2(d), the provisions of Section 3.3 above and 6.2(b) below do not apply to any Transfer by Death made by a Shareholder at his death to—

    (i)     any member of the Shareholder's Immediate Family;

    (ii)     the trustee of a testamentary trust for the sole benefit of one or more members of the Shareholder's Immediate Family, provided that the trust qualifies to be a shareholder of an S-Corp, and the trust terminates before the time at which the trust would cease to be a qualified shareholder of an S-Corp..

Any transfer to a child (or adopted child or step child) who is less than twenty-one years old at the time of the transfer must be conditioned on the guardian of such child's retaining the right to do any act with respect to the transferred Shares on behalf of the transferee that is permitted, authorized, or required by this Agreement.

(b)     On the death of a Shareholder, and in the event that the Shareholder is not survived by the Shareholder's Immediate Family, or for any Shares that the Shareholder attempts by will, trust, intestacy or other testamentary devise to gift, transfer, bequeath or devise to anyone other than one of the Other Shareholders to this Agreement, or to the Immediate Family of the Shareholder or to the Immediate Family of one of the Other Shareholders, the Other Shareholders have the exclusive right and option to purchase all or any portion of the Shares owned by the Shareholder, that would otherwise pass to a person who is not one of the Other Shareholders, or a member of the Immediate Family of the Other Shareholders or the Shareholder, and the Shareholder (or his Personal Representative) has the right and option to require the Other Shareholders to purchase all or any portion of the Shares that would otherwise pass to a person who is not one of the Other Shareholders, or a member of the Immediate Family of the Other Shareholders or the Shareholder, at the purchase price per Share determined pursuant to Section 7.1 below to be payable in accordance with Section 7.2(a). On exercise of this option, the Shareholder's Personal Representative is obligated to sell the Shares to the Other Shareholders on these terms, and the Other Shareholders are obligated, to the extent it may lawfully do so, to purchase the Shares. Notice of the exercise of the option granted pursuant to this Section 6.2 is to be given to or by the Shareholder (or his Personal Representative) within thirty days after the Other Shareholders receive notice of the qualification of Shareholder's Personal Representative.

(c)     The Other Shareholders have the right to purchase all or any portion of the remaining available Shares on a Pro Rata basis or as the Other Shareholders may otherwise agree among themselves.

(d)     If and to the extent that the Other Shareholders do not purchase all the available Shares, each Successor of that Shareholder is entitled to require the Corporation to transfer the appropriate portion of the Shareholder's Shares to the Successor on the provision that (1) the Successor give to the Corporation and the Other Shareholders documentation as may be requested by the Corporation and/or the Other Shareholders to

evidence the rightful ownership interest of the Successor in the Shareholder's Shares and (2) the Successor becomes a party to this Agreement in accordance with the provisions of Section 3.2 above.

6.3     Divorce of Shareholder and Spouse.   If any Shares are owned by a Shareholder and Spouse jointly and that Shareholder or Spouse files a petition for divorce or institutes any other legal proceedings to terminate their marriage, the following procedures apply:

(a)     Shareholder's interest in the Shares and Spouse's Spousal Interest in the Shares will be reflected on their respective inventories of marital and separate assets at a value not in excess of the purchase price determined pursuant to Section 7.1 below.

(b)     Shareholder will seek, and the Spouse will agree to accept, an order for the division of marital and separate property under which Shareholder receives the entire Spousal Interest in the Shares in exchange for awarding to the Spouse other marital and separate assets in which Shareholder has an interest that have a value approximately equal to the Spousal Interest (as valued pursuant to Section 6.3(a)).

(c)     If the marriage of Shareholder and Spouse is terminated by divorce or annulment and Shareholder does not obtain all of Spouse's interest in the Shares incident to the divorce or annulment, Shareholder and Spouse will simultaneously give written notice to the Other Shareholders within thirty days after the effective date of the final, nonappealable divorce decree or of the annulment. The written notice will specify the effective date of termination of the marriage and the number of Shares in which the Shareholder's former Spouse retains an interest. For a period of sixty days after the effective date of termination of the marriage, the Shareholder has an exclusive option to purchase all or any portion of the former Spouse's retained interest in the Shares at the purchase price per Share determined pursuant to Section 7.1 to be payable in accordance with Section 7.2(b). The Shareholder's sixty-day option is exercised by delivering to the former Spouse and the Other Shareholders written notice specifying the number of Shares as to which the option is being exercised.

(d)     If the Shareholder does not purchase all of the former Spouse's Shares, for a period of sixty days after the lapse of the sixty-day option period, the Other Shareholders have an exclusive option exercisable by written notice to the former Spouse to purchase all or any portion of the former Spouse's remaining Shares at the purchase price per Share determined pursuant to Section 7.1 to be payable in accordance with Section 7.2(b) on a Pro Rata basis or as the Other Shareholders may otherwise agree among themselves.

(e)     If any option is exercised pursuant to this Section 6.3, the former Spouse is obligated to sell the Shares retained incident to divorce or annulment with respect to which the option or options are exercised. If a Shareholder should exercise his option to purchase any number of Shares owned by the former Spouse pursuant to the provisions of this Section 6.3, the provisions of Sections 7.2, 7.3, 8.1, and 8.2 below will apply with respect to the purchase of the Shares by the Shareholder.

(f)     Shareholder and Spouse each agree that the Other Shareholders may intervene in their divorce or annulment proceeding without their objection for the purpose of enforcing the Other Shareholders' rights under this Section 6.3.

## Article 7
## Purchase Price and Terms

7.1     Purchase Price.   The parties to this Agreement acknowledge that the Common Stock is closely held, no public market exists for the Common Stock, and, consequently, a fair market value for the Shares is not readily determinable. Therefore, as used throughout this Agreement, the phrase the purchase price per Share determined pursuant to Section 7.1 will be the quotient of the Corporation's accrual basis book value as of the last day of the month immediately preceding the closing of the purchase of the Shares being purchased (determined in accordance with generally accepted accounting principles) divided by the total number of Shares then issued and outstanding for all shareholders of the Corporation, including shareholders of the Corporation who are not parties to this Agreement (determined in accordance with the Corporation's stock records).

7.2     Payment of Purchase Price.   Payment of the purchase price for Shares purchased by the Other Shareholders (the "Purchasers") pursuant to this Agreement is to be made, at the sole discretion of the Purchasers by either one of the two following methods:

(a)     On the closing date of the purchase, the Purchasers deliver to the selling Shareholder a cash payment equal to 100 percent of the total purchase price; or

(b)     On the closing date of the purchase, the Purchasers deliver to the selling Shareholder a cash down payment equal to 10% percent of the total purchase price, and the Purchasers pay the balance of the total purchase price in 10 equal annual installments.

7.3     Deliveries at Closing.   At the closing of the purchase of any Shares to be made by the Purchasers under any provision of this Agreement, the selling Shareholder and the Purchasers are obligated to sign and deliver the following instruments, certificates, and agreements:

(a)     The Purchasers deliver to the selling Shareholder—

(1)     the amount of cash required to be delivered; and

(2)     a promissory note for the balance of the purchase price if the purchase price is payable in accordance with Section 7.2(b).

(b)     The selling Shareholder delivers to the Purchasers—

(1)     certificates representing the Shares being purchased by the Purchasers endorsed for transfer to the Purchasers, free of all liens, claims, and encumbrances; and

(2) other instruments of assignment, certificates of authority, tax releases, consents to transfer, and instruments in evidence of title in compliance with this Agreement as may be reasonably required by the Purchasers.

## Article 8
## Closing Date and Notices

8.1 <u>Closing Date</u>. Whenever the Purchasers agree or become obligated to purchase Shares under the terms of this Agreement, the closing date of the transaction will be a date and time specified by the Purchasers at a designated location. Unless the parties agree to the contrary, the closing date may not be more than ninety days after the event or notice that fixed the obligation of the Purchasers to purchase the Shares. Notice of the details of closing will be furnished by the Purchasers no later than ten days before the closing date.

8.2 <u>Notices</u>. All notices, communications, and deliveries made under this Agreement will be made in writing signed by or on behalf of the party, will specify the section of the Agreement under which it is given or made, and will be delivered personally, by facsimile transmission, by registered or certified mail (return receipt requested), or by any courier service, with postage or other fees prepaid, to the addresses listed on <u>Exhibit A</u>:

Any such notice, communication, or delivery may also be made to any other address or person designated in writing by the party. Such addresses may be changed from time to time by written notice to the other party. Any notice, communication, or delivery will be deemed given or made (a) on the date of delivery if delivered in person or by courier service, (b) on transmission by facsimile if receipt is confirmed by telephone, or (c) on the fifth business day after it is mailed by registered or certified mail.

## Article 9
## Enforcement

9.1 <u>Endorsements on Stock Certificates</u>. Each certificate representing Shares now owned or hereafter owned by the Shareholders or any transferee must conspicuously state substantially as follows, in addition to any other legends required by law:

THESE SHARES ARE SUBJECT TO CERTAIN RESTRICTIONS AGAINST TRANSFER PURSUANT TO THE TERMS OF A SHAREHOLDERS' AGREEMENT BETWEEN CERTAIN SHAREHOLDERS OF THIS CORPORATION THAT PROVIDES FOR, AMONG OTHER THINGS, AN OPTION IN FAVOR OF THE PARTIES TO SUCH AGREEMENT TO PURCHASE THESE SHARES IN CERTAIN INSTANCES. THE PARTIES TO SUCH AGREEMENT WILL FURNISH WITHOUT CHARGE A COPY OF THE AGREEMENT TO THE RECORD HOLDER OF THIS CERTIFICATE ON WRITTEN REQUEST TO _____.

THESE SHARES ARE SUBJECT TO THE PROVISIONS OF A SHAREHOLDERS' AGREEMENT THAT MAY PROVIDE FOR MANAGEMENT OF THE CORPORATION IN

A MANNER DIFFERENT THAN IN OTHER CORPORATIONS AND MAY SUBJECT A SHAREHOLDER TO CERTAIN OBLIGATIONS OR LIABILITIES NOT OTHERWISE IMPOSED ON SHAREHOLDERS IN OTHER CORPORATIONS.

THESE SHARES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY APPLICABLE STATE SECURITIES LAWS, AND THEY CANNOT BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED, OR OTHERWISE HYPOTHECATED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND STATE SECURITIES LAWS OR ON DELIVERY TO THE CORPORATION OF AN OPINION OF LEGAL COUNSEL SATISFACTORY TO THE CORPORATION THAT AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

THIS CORPORATION HAS ELECTED TO BE TAXED AS AN "S" CORPORATION FOR FEDERAL INCOME TAX PURPOSES UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"). ANY SALE, TRANSFER, OR OTHER FORM OF DISPOSITION OF THESE SHARES THAT WOULD CAUSE THIS CORPORATION TO LOSE ITS STATUS AS AN "S" CORPORATION UNDER THE CODE IS VOID.

9.2     Breach and Equitable Relief.  Any purported Transfer in breach of any provision of this Agreement is void, will not operate to Transfer any interest or title in the purported transferee, and will constitute an offer by the breaching Shareholder to sell his Shares to the Corporation at the purchase price per Share determined pursuant to Section 7.1 above to be payable in accordance with Section 7.2(b). In connection with any attempted Transfer in breach of this Agreement, the Corporation may refuse to transfer any Shares or any stock certificate tendered to it for Transfer, in addition to and without prejudice to any other rights or remedies available to the Corporation. Each party to this Agreement acknowledges that each other party will suffer immediate and irreparable harm if a party hereto breaches, attempts to breach, or threatens to breach this Agreement and that monetary damages will be inadequate to compensate the nonbreaching parties for any actual, attempted, or threatened breach. Accordingly, each party hereto agrees that each of the other parties will, in addition to any other remedies available to them at law or in equity, be entitled to specific performance or temporary, preliminary, and permanent injunctive relief to enforce the terms and conditions of this Agreement without the necessity of proving inadequacy of legal remedies or irreparable harm, or posting bond, any requirements to equitable and injunctive relief being hereby specifically waived.

9.3     Governing Law and Severability.  All questions concerning the construction, validity, and interpretation of this Agreement, including the relative rights of the Corporation and the Shareholders, are governed by and construed in accordance with the laws of the state of Texas. If any term, provision, covenant, or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the terms, provisions, covenants, and restrictions will remain in full force and effect and will in no way be affected, impaired, or invalidated. It is hereby stipulated and declared to be the intention of the parties that they would have signed this Agreement had any terms, provisions, covenants, and restrictions that may be hereafter declared invalid, void, or unenforceable not initially been included in this Agreement.

## Article 10
## Effect

10.1    Binding Effect.    Nothing in this Agreement, express or implied, is intended to confer on any party, other than the parties hereto and their respective permitted assigns, any rights, remedies, obligations, or liabilities under or by reason of this Agreement, and no person who is not a party to this Agreement may rely on the terms except as otherwise set out. This Agreement (a) constitutes the entire agreement between the parties relating to the subject matter hereof and (b) supersedes all previous understandings and agreements between the parties relating to the subject matter hereof, both oral and written. This Agreement is binding on, inures to the benefit of, and is enforceable by the parties hereto, including the Corporation and its successors and assigns as well as the Shareholders and Spouses and their respective heirs, legatees, devisees, legal representatives, successors, and permitted assigns.

10.2    Spouses.    The Spouses are fully aware of, understand, and agree to the provisions of this Agreement and its binding effect on any interest that Spouse may have by reason of marriage to a Shareholder in any Shares subject to the terms of this Agreement held in the Shareholder's name on the stock records of the Corporation at or after execution of this Agreement. Any obligation of a Shareholder or his legal representative to sell or offer to sell Shares under the terms of this Agreement includes an obligation on the part of the Shareholder's Spouse to sell or offer to sell any interest that Spouse may have in the Shares in the same manner.

10.3    Representations and Warranties.    No party to this Agreement is making any representations or warranties concerning the business operations or financial condition of the Corporation, because all the parties are equally familiar with the business operations and financial condition of the Corporation. All parties to this Agreement represent, warrant, and covenant that they have full power, legal capacity, and authority to enter into and perform this Agreement in accordance with its terms and that they will perform all agreements made by them under this Agreement in accordance with its terms.

## Article 11
## Assignment, Amendment, Waiver, and Termination

11.1    Assignment.    No party to this Agreement may assign its rights or delegate its obligations hereunder without the prior written consent of each party. Any such attempted assignment will be void *ab initio*. Subject to the preceding sentences, this Agreement will be binding on and inure to the benefit of the parties and their respective successors and assigns.

11.2    Amendment.    This Agreement may be amended at any time by a written instrument signed by the Shareholders holding at least two-thirds of the Shares then subject to this Agreement, provided that no amendment may adversely affect any rights of any party under this Agreement that have vested before amendment.

11.3    Waiver.    Any waiver of the terms or conditions in this Agreement may be made only by a written instrument signed and delivered by the party waiving compliance. The failure

of any party at any time to require performance of any provisions of this Agreement in no manner affects the right to enforce. No waiver by any party of any term or condition, nor the breach of any term or condition contained in this Agreement, is deemed to be (a) a further or continuing waiver of the term, condition, or breach or (b) a waiver of any other term, condition, or breach of any other term or condition.

11.4 <u>Termination</u>. This Agreement terminates on the occurrence of—

(a) the written agreement of Shareholders holding at least two-thirds of the Shares then subject to this Agreement, provided that no termination may affect adversely any rights that have vested before termination;

(b) the naming of the Corporation as debtor in bankruptcy proceedings for a period of sixty days without dismissal, the execution by the Corporation of an assignment for the benefit of its creditors, the appointment of a receiver for the Corporation, or the voluntary or involuntary liquidation or dissolution of the Corporation; or

(c) the consummation of an initial public offering by the Corporation.

**Article 12**
**Miscellaneous**

12.1 <u>Further Assurances</u>. All parties to this Agreement agree to take further actions and execute and deliver other documents, certificates, agreements, and other instruments as may be reasonably necessary or desirable to implement transactions contemplated by this Agreement.

12.2 <u>Construction and Certain References</u>. When the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter, and the number of all words includes the singular and plural. Unless expressly stated otherwise, references to "include" or "including" mean "including, without limitation." "Hereto," "herein," or "hereunder" refer to this Agreement as a whole and not to any particular article or section hereof. All titles and headings to articles and sections in this Agreement are included for convenience and ease of reference only and do not affect the meaning or interpretation of articles or sections of this Agreement. Unless otherwise specified, all references to specific articles, sections, or exhibits are references to articles, sections, and exhibits to this Agreement.

12.3 <u>Time of Essence</u>. Time is of the essence in the performance of obligations of this Agreement.

12.4 <u>Counterparts</u>. This Agreement may be signed in multiple counterparts, each of which will be considered an original but all of which together will constitute one and the same instrument, and in making proof of this Agreement it is not necessary to produce or account for more than one counterpart.

12.5 <u>Mediation and Arbitration</u>. If a claim, demand, disagreement, controversy, or dispute (collectively, "Dispute") arises in connection with this Agreement or the breach thereof

and if the Dispute cannot be settled through direct discussions, the parties agree to endeavor first to settle the Dispute in an amicable manner by mediation to be held in Lubbock, Lubbock County, Texas, United States of America, administered by the American Arbitration Association under its Commercial Mediation Rules before resorting to arbitration. The mediation will be completed within thirty days of receipt of written demand for mediation. Thereafter, any unresolved controversy or claim relating to this Agreement or breach thereof will be settled by binding arbitration initiated by written notice by either party to the other of the intent to arbitrate. The arbitration will be held in Lubbock, Lubbock County, Texas, United States of America, and administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment on the award rendered may be entered in any court having jurisdiction. Notwithstanding any other provision of this Agreement or this Section 12.5 to the contrary, no party will be precluded from seeking injunctive relief or a temporary restraining order before implementing procedures for mediation or arbitration, provided that such party determines in the good-faith exercise of its reasonable best judgment that it will suffer irreparable harm or injury by any delay caused by mediation or arbitration proceedings.

By signing below, the above-named Shareholder and Spouse, if applicable, (1) agree to become parties to and bound by the terms and provisions contained in the Shareholders' Agreement of Russell E. Womack, Inc. dated effective [date] and (2) acknowledge that they have previously received a copy of the Shareholders' Agreement.

**SHAREHOLDERS:**

| SIGNATURES | NUMBER OF SHARES | DATE SIGNED |
|---|---|---|
| *Nancy Higginson* | | 1-2-08 |
| Nancy Higginson | | |
| Address for Notice: 11306 CR 7100, Wolfforth, TX 79382 | | |
| *Debbie Cheadle* | | 1-2-08 |
| Debbie Cheadle | | |
| Address for Notice: 11856 Cottage Side Way Draper Ut 84020 | | |
| *Edward Cheadle* | | 1-2-08 |
| Edward Cheadle, as personal representative of Camille Sawaya, Deceased | | |
| Address for Notice: 1954 Longbranch Dr Draper, Ut 84020 | | |
| *Arthur Cheadle* | | 1-2-08 |
| Arthur Cheadle | | |
| Address for Notice: 6307 Oles Lane S.L.C. Ut 84121 | | |

_Raeanne Martin_            1-17-08

Raeanne Martin
Address for Notice: 408 S State Caney, KS 67333

_Wayne Carson_            1-9-08

Wayne Carson
Address for Notice: 5302 Fannin Amarillo TX. 79110

**Exhibit A**
**List of Shareholders**

| Name | Number of Shares | % ownership |
|------|-----------------|-------------|
| Nancy Higginson | _____ | _____ |

Address for Notice: *11306 CR 7100, Wolfforth, Tx, 79.982*

Debbie Cheadle _____

Address for Notice: *1856 Collageside Way Draper Ut 84020*

Edward Cheadle, as personal _____  _____
representative of Camille Sawaya, Deceased

Address for Notice: *1954 Longbranch Dr, Draper Ut 84020*

Arthur Cheadle _____  _____

Address for Notice: *6307 Oles Lane S.L.C Ut 84121*

Raeanne Martin _____  _____

Address for Notice: _____

Wayne Carson _____  _____

Address for Notice: *5302 Fannin Amarillo, Tx. 79110*

# TAB 3

| | § |
|---|---|
| WAYNE CARSON, DEBBIE CHEADLE, | § |
| EDWARD CHEADLE, EDWARD CHEADLE, | § |
| ARTHUR CHEADLE, NANCY HIGGINSON, | § |
| FINNEY CHEADLE, CHERYL SHOOP, | § |
| KEITH SAWAYA | § |

AAA ARBITRATION
NO. 71-20-1400-2743

V.

RAEANNE MARTIN

## PLAINTIFFS' FIRST AMENDED ORIGINAL PETITION IN ARBITRATION

COMES NOW Plaintiffs, WAYNE CARSON, DEBBIE CHEADLE, EDWARD CHEADLE, ARTHUR CHEADLE, NANCY HIGGINSON, FINNEY CHEADLE, CHERYL SHOOP, KEITH SAWAYA complaining of Defendant, RAEANNE MARTIN, and would show the Court as follows:

### I. PARTIES

1.      Plaintiffs, Wayne Carson, is a resident of Randall County, Texas; Arthur Cheadle, is a resident of Salt Lake City, Utah, Debbie Cheadle, is a resident of Draper, Utah, Edward Cheadle, is a resident of Sandy, Utah, Finney Cheadle, is a resident of Houston, Texas, Nancy Higginson, is a resident of Lubbock, Texas, Keith Sawaya, is a resident of Sandy, Utah, and Cheryl Shoop, is a resident of Tooele, Utah (Collectively referred to as "Plaintiffs" or "Carson Family").

2.      Defendant, Raeanne Martin, is an individual who resides in Van Alstyne, Texas, and has appeared in this arbitration by and through her attorney of record Jeff Lane.

### II. JURISDICTION AND VENUE

3.      The parties voluntarily agreed to jurisdiction and venue of their claims arising out of a Shareholder Agreement in Lubbock County, Texas because the Shareholder Agreement specifically requires the arbitration to be held Lubbock County, Texas. (Exh. 1 pp. 14-15, ¶ 12.5). Further, the 72nd Judicial District Court of Lubbock County, Texas has ordered the

aforementioned parties to arbitration pursuant to their agreement. (Exh. 16). The parties have attended AAA mediation pursuant to the agreement but were unable to reconcile.

### III. BACKGROUND

4.     Russell E. Womack ("Russell") was the original sole shareholder in Russell E. Womack, Inc. ("The Company"). He was married to Beverly B. Womack ("Beverly") who predeceased him. Russell and Beverly did not have any children during their marriage. Russell died on January 18, 2006 leaving a handwritten will and codicil giving his entire estate to both his and Beverly's nieces and nephews.

**The Probate**

5.     On April 27, 2006 a suit was initiated regarding the Combined Application for Identification of Distributees for Probate of Will, For Appointment of Independent Executor, and for Waiver of Bond ("the Application"), filed by James E. Byrne.

6.    The Application alleged that James B. Byrne, Jr., Barbara Holladay, Michael V. Byrne, Richard H. Byrne, West Womack, and Carolyn Victoria Cain ("the Byrnes Family") were the only nieces and nephews of Russell.

7.    Thereafter, Deah'dra Anne Cummings ("Cummings"), asserted a claim as an adopted niece of Russell.

8.    The nieces and nephews of Beverly included in the probate litigation were Raeanne Martin, Wayne Carson, Arthur Cheadle, Debbie Cheadle, Edward Cheadle as personal representative of the Estate of Camille Sawaya, Finney Cheadle, and Nancy Higginson (collectively referred to as "The Family"). The Family each and collectively objected to Cumming's claim to the inheritance. The Family was jointly represented in Russell's probate by Andy Stewart of Mullin, Hoard, & Brown, LLP. After negotiating a future joint purchase of

Cumming's shares in the Company, the Family removed their joint objections to Cummings claims.

9. The Court found that as a matter of law, Russell intended to distribute his estate to James E. Byrne, Jr., Barbara Holladay, Michael V. Byrne, Richard H. Byrne, West Womack, Carolyn Victoria Cain, Nancy Higginson, Arthur Cheadle, Debbie Cheadle, Camille Sawaya, Raeanne Martin, Wayne Carson, and Deah'dra Anne Cummings.

10. The Byrnes Family appealed the Court's determination but the Appellate Court affirmed and the Russell's estate was distributed according to the trial court's determination found in paragraph 9 hereinabove.

**The Shareholder Agreement**

11. After the appeal, The Family which includes only the parties to this arbitration purchased Cumming's shares in the company and distributed them among themselves pro rata. The acquisition of the Cumming's shares gave the Family a majority of the voting shares in the Company. In the interim, shares of REWI owned by the Estate of Camille Sawaya were distributed to her heirs and gifts to immediate family members by certain Carson Family Plaintiffs were made to their siblings pursuant Article 4 of the Shareholder Agreement. (Exh.1, p. 5). As a result of their joint efforts to obtain a majority, the Family entered into a Shareholders Agreement Between Certain Shareholders of Russell E. Womack, Inc., dated January 1, 2008 ("Shareholder Agreement") (Exh. 1).

12. The Shareholder Agreement allowed any remaining Family members to keep the hard earned majority shares in the event one or more of them desired to sell their shares for a certain offered price by and through a right of first refusal (Exh. 1, ¶3.3). Again, Andy Stewart represented The Family in drafting the joint Shareholder Agreement. Raeanne Martin executed

the Shareholders' Agreement along with her Family of their own free will and for their own mutual benefit of maintaining a majority.

13.    Originally, all family members except Wayne Carson and Raeanne Martin desired to enter into a voting trust to keep their vote in a singular person. Cousins, Wayne Carson and his sister Raeanne Martin were asked to join the voting trust. Martin and Carson had numerous conversations regarding whether to join the voting trust or not. Martin wanted an opt out provision for the voting trust. As a result, a Voting Trust was entered into on December 31, 2007 by the entire Family. (Exh. 17). However, it is important to note that the formalities of the voting instructions were never followed and all shareholders voted their own shares. Again, the Family was jointly represented by Andy Stewart with Mullin, Hoard, and Brown in preparation of the Voting Trust. The Voting Trust specifically authorized only Wayne Carson and Raeanne Martin to opt out of the Voting Trust. (Exh. 17, ¶ 8.1).

14.    On December 1, 2012, Raeanne Martin opted out of the Voting Trust. (Exh. 18). Wayne Carson did not opt out of the Voting Trust. As a result, all of the Plaintiffs herein are subject to the Shareholder Agreement and the Voting Trust now. The formalities of the voting trust have currently been submitted to REWI. It follows that any shares of stock purchased by any of the other contracting persons by and through the Shareholder Agreement would be subject to the Shareholder Agreement and Voting Trust.

## Martin Triggers Right of First Refusal and Same was Accepted

15.    Over five years later, on February 28, 2013 Ryan J. Bigbee, attorney for Mike Byrne, made an offer to purchase all of Martin's shares in the Company for $3,130,000.00 ("The Offer")(Exh. 2). Martin conditionally accepted The Offer on March 4, 2013(Exh 3). On March 7, 2013, the Family requested formal compliance with the offer notice provisions required in the

Shareholder Agreement (Exh 4; Exh. 1). Martin complied with the offer notice provisions of the Shareholder Agreement the next day (Exh. 5; Exh. 1). Importantly, Martin indicates that there are no other contractual arrangements with Byrnes or any other person related to the Offer (Exh. 5. ¶9).

16.     On March 18, 2013, the Carson Family agreed to accept The Offer pursuant to the terms of the Shareholder Agreement electing to make full payment of the purchase price as opposed to paying it out over time as allowed by the Shareholder Agreement. (Exh. 6). Despite not being required to close by the date established in The Offer, the Carson Family also agreed to close on March 22, 2013 at Mr. Lane's office in Dallas, Texas (Exh. 6). The acceptance and request to set a closing were performed by Carson Family well within the contractual deadlines and before any revocation of The Offer by Byrnes or refusal to sell by Martin (Exhs. 1-6).

17.     By the express terms of the Shareholders' Agreement, Martin received a proposed Voluntary Transfer and accepted same. As such, Section 3.3 of the Shareholders' Agreement was triggered and the Carson Family acknowledged receipt of the offer notice and tendered their acceptance.

## Post-Trigger Conduct

18.     Despite Martin complying with every contractual provision established by the Shareholder Agreement except delivery of the shares, Martin indicated she was proceeding with the March 22, 2013 Byrnes closing and indicated that "[d]elaying the closing, however will require [her attorney] being convinced there is some legal authority and argument to do so" (Exh. 5). On March 19, 2013, counsel for Carson Family and Wayne Carson met with Jeff Lane and Martin in Dallas, Texas. After said meeting, Martin postponed the Byrnes closing until the Purchasers complied with her request for information (Exh. 11).

### a. *Information Provided by Purchasers*

19.     On March 28, 2013, the Carson Family provided a brief position statement to Martin at her request outlining the simple fact that the Shareholder Agreement is valid, enforceable and the buy/sell was triggered (Exh. 7). The Carson Family also demonstrated that the Offer was irrevocable (Exh. 7).

### b. *Martin Files Suit Asserting Positions of Non-Contracted Party*

20.     On April 11, 2013, Martin filed a Declaratory Petition seeking the Court to declare "...that the Putative Shareholder Agreement is unenforceable, and therefore does not give the Other Signatories the preemptive right to purchase Plaintiff's shares for the same amount as the proposed sale to Michael and Richard Byrne." (Orig. Pet. p.8, ¶28; Exh. 14). In response and consistent with the Shareholder Agreement, the Carson Family sought injunctive relief and the parties entered into an Agreed Temporary Restraining Order which expired by its own terms on September 13, 2013. A hearing continuing the permanent injunction hearing postponed on September 13, 2013 were set for September 20, 2013. In the interim, Martin transferred the shares in question which were subject to the Shareholder Agreement to Richard and Michael Byrnes for $3,130,000.00. (Exh 14). The Court never ruled on the Plaintiffs' permanent injunction due to the issue being moot.

21.     In the underlying cause, Martin championed the position and asserted that she was fraudulently induced by her own lawyer to sign the Family Shareholder Agreement, a nebulous post–Agreement vote of only a few shareholders made the Shareholder Agreement void and asserted defenses of waiver and/or estoppel. Martin simply disregarded the fact that she signed the Shareholder Agreement in January of 2008 to secure a majority interest for her entire family. It wasn't until five (5) years later with no prior objections that Martin filed a declaratory

judgment seeking to undo the Shareholder Agreement. A position one might infer enriched Martin to the tune of $3,130,000.00 regardless of who purchased them, her family with whom she contracted or the non-family, non-signatory buyers.

c. *Purchasers' Tender and Martin's Failure to Appear at Closing*

22. On April 24, 2013, the Carson Family consistent with the terms of the Shareholder Agreement set the date, time and location for the closing of the accepted offer within the ninety (90) day time frame required (Exh. 8). On April 25, 2013, Martin advised that she received the closing notice and indicated that no one would attend the closing on her behalf (Exh. 9).

23. On April 30, 2013 at 10:00am in the law offices of Field, Manning, Stone, Hawthorne, & Aycock, P.C. located at 2112 Indiana Ave. Lubbock, Texas 79410, J. Paul Manning on behalf of the Purchasers appeared in person and waited until 10:12am before he made the attached record (Closing p.2). At said closing, Mr. Manning was authorized by the Purchasers to take possession of Martin's endorsed shares of stock, make a copy of same and forward to Amarillo National Bank (ANB). Upon receipt of Martin's endorsed shares of stock, ANB agreed to wire the funds to Martin pursuant to her instructions or issue a cashier's check made payable to her for the entire offer amount (Exh. 10).

24. Neither Martin nor her attorney appeared for the closing set on April 30, 2013 (Closing p.2-6).

**Transfer of Martin's Stock**

25. On March 6, 2014, the Court denied all respective summary judgment motions on the respective declaratory claims of Martin and the Carson Family. (Exh. 12). The Court did not rule on the issue of a permanent injunction. The Agreed Temporary Injuction expired on

September 13, 2013 by its own terms. (Exh. 13). On or about September 23, 2013, Martin and Mike and Richard Byrnes closed the sale of Martin's stock in the company for the sum matched by the Carson Family. (Exh. 14). This transfer was a direct breach of the Shareholder Agreement. As a result, the Plaintiffs have lost the majority of shares they contracted for to control REWI by Martin's circumvention of the Shareholder Agreement signed in 2008.

**Order to Arbitrate**

26. On September 5, 2013, the Carson Family demanded mediation of their claims against Martin through the AAA. (Exh. 15). On March 6, 2014, the Court ordered all claims between Martin and the Carson Family to AAA arbitration. (Exh. 16). On April 7, 2014, the Carson Family and Martin mediated through AAA mediator, Randy Duke, but were unable to resolve the issues. All conditions precedent have been satisfied by Plaintiffs.

## IV. CAUSES OF ACTION

### A. BREACH OF CONTRACT

**A VALID CONTRACT EXISTED**

27. The following elements are required for the formation of a valid contract: (1) an offer, (2) acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Cessna Aircraft Co. v. Aircraft Network, L.L.C.*, 213 S.W.3d 455, 465 (Tex. App.—Dallas 2006, pet. denied). Whether an alleged agreement constitutes an enforceable contract is a question of law. *Effel v. McGarry*, 339 S.W.3d 789, 793 (Tex. App.—Dallas 2011, pet. denied); *Mickens v. Longhorn DFW Moving, Inc.*, 264 S.W.3d 875, 880 (Tex. App.—Dallas 2008; pet. denied).

28.     In the present case, the Shareholder Agreement was entered into and executed by the nieces and nephews of Beverly Womack (Exh. 1). The Family entered into the Shareholder Agreement after a negotiated and joint representation to protect each of their hard earned efforts and investments in obtaining a majority in the Company. The Family, including Martin, accepted and consented to all the terms in the Shareholder Agreement, executed same and delivered it to each other with the intent to be bound by same. (Exh. 1). Nothing asserted by Martin in her declaratory judgment negates the valid formation of the contract as a matter of law. As such, the contract is valid.

29.     Further, in order for a Court to order parties to arbitration, the existence of a valid and binding contract must be present. *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 737 (Tex. 2005); *In re Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 195 S.W.3d 807, 813 (Tex. App.-Dallas 2006, orig. proceeding). The fact that the 72nd District Court of Lubbock County, Texas ordered the parties before this panel to arbitration mandates that the Shareholder Agreement is a valid, enforceable contract. As such, Plaintiffs ask this panel to take judicial notice that the Shareholder Agreement is valid and enforceable as previously adjudicated.

30.     Next, the Shareholder Agreement contains a right of first refusal that is valid because it is consistent with §21.210 of the Business Organizations Code which provides for restrictions on the transfer of a corporation's securities between two or more holders of the securities (Exh. 1, ¶3.3). TEX. BUS. ORG. CODE §21.210. The Shareholder Agreement also complies with §21.211 of the Business Organizations Code by reasonably obligating the holder of the restricted security to offer to other holders of the securities of the corporation, an opportunity to acquire the restricted security. TEX. BUS. ORG. CODE §21.211. Accordingly,

Martin's shares of stock in Russell E. Womack, Inc. were subject to the buy/sell provision of the Shareholder Agreement as a matter of law.

**THE BUY/SELL OPTION WAS TRIGGERED AND IRREVOCABLE BETWEEN THE PARTIES**

31.     Moreover, the buy/sell provisions of Martin's shares of the stock in Russell E. Womack, Inc. have been triggered.   The Shareholders' Agreement defines a "Voluntary Transfer" as a transfer of any interest in the shares by the free and voluntary act of the Transferor. (Exh. 1, p. 3). A Transfer is defined to include a sale. (Exh. 1, p. 3). Section 3.3 of the Shareholders' Agreement provides the mechanism by which the Purchasers are given the right to purchase the shares of a Family member who desires to enter into a Voluntary Transfer. (Exh. 1, p. 4). The first part of Section 3.3 states "any _proposed_ Voluntary Transfer of any shares by a shareholder is subject to the following provisions." (Exh. 1, p. 4). It is undisputed that Martin triggered the Buy Sell Provisions as outlined hereinabove in Paragraphs 5-30.

32.     Texas law mandates that once an offer is made under a buy sell agreement, it becomes an irrevocable option. *Abraham Investment Co v. Payne Ranch, Inc.*, 968 S.W.2d 518 (Tex. App.—Amarillo 1998, pet. denied).   The *Abraham* case involves a right of first refusal where the owner (Payne) entered into a sales contract for the purchase of the property with another (AIC). *Id.* The right of first refusal was held by the owner's lessee, Campbell. As in this case, the owner attempted to condition the sales contract on the exercise of Campbell's preferential right, but nonetheless went through the notice requirements under the contract. *Id.* The *Abraham* Court citing other longstanding legal precedent with regard to buy/sell agreements correctly held that "at the moment a property owner gives notice of his intent to sell, a preferential right 'ripens' into an option." *Id.* at 524.

33.    The Houston 14th Court of Appeals concurs with Amarillo in *Riley v. Campeau Homes Inc.*, when it ruled that a right of first refusal was triggered and became irrevocable when the owners of the unit decided to sell despite their attempts to withdraw from the sale in order to avoid the exercise of the right. *Riley v. Campeau Homes (TEXAS) Inc.*, 808 S.W.2d 184 (Tex. App.—Houston [14th Dist.] 1991, writ dism'd by agr.).  In particular, the *Riley* court ruled that when a seller is required to notify the holder of the right of first refusal, the right becomes an enforceable option and that the seller could not simply withdraw from the sale in order to avoid the exercise of the right. *Id.*

34.    In fact, a South Dakota case dealing with the sale of stock cites *Abraham* for the same proposition that "after the property owner has given his notice-of-intent-to-sell, he cannot change the terms of that offer" and when "a property owner gives notice of his intent to sell, a preferential right 'ripens' into an option." *Estate of Lien v. Pete Lien & Sons*, 740 N.W.2d 115 121 (South Dakota 2007).

35.    Despite Martin's attempts to circumvent, precedent mandates that the Purchasers rights immediately ripen into irrevocable options.  First, Byrnes made an offer to Martin subject of the Shareholder buy sell agreement (Exh. 2).  Martin also accepted the Offer and gave notice of offer to Purchasers pursuant to the Shareholder Agreement (Exh. 5).  Purchasers accepted the irrevocable offer and tendered performance timely by setting a closing and having funds available at the closing (Exh. 6, 8, 10).  Therefore, as a matter of law, Purchasers timely accepted the irrevocable offer pursuant to the Shareholder Agreement to purchase all of Raeanne Martin's shares of stock in Russell E. Womack, Inc. for $3,130,000 and satisfied all conditions precedent that must occur until transfer of the shares in exchange for the proceeds.

36.     Notwithstanding, the existence of a valid contract, a valid triggering offer, Martin's compliance with the notice provision and Plaintiffs' valid matching offer, Martin voluntarily transferred her shares in REWI in breach of the Shareholder Agreement to Richard and Mike Byrne for $3,130,000.00. The breach resulted in the immediate diminution in value of Plaintiffs' shares of stock in REWI and unjustly enriched Martin with benefits owned by all parties to the Shareholder Agreement. As a result, Plaintiffs have been damaged for which Plaintiffs now seek monetary damages from Martin.

### B.     Promissory Estoppel

37.     The Carson Family adopts and incorporates the allegations contained in Paragraphs 1-36, above and would show that such allegations evidence promissory estoppel.

38.     Defendant falsely misrepresented material facts concerning the Shareholder Agreement and the creation of the Shareholder Agreement that she executed, as more specifically set out in Paragraphs 1-34. The misrepresentations were made by Defendant with actual or constructive knowledge of the truth. The Carson Family, however, had no knowledge of the truth or reasonable means of determining the truth. Additionally, The Carson Family took every reasonable action to ensure that such statements made by Defendant were in fact true. Defendant made the misrepresentations with the intention that such be acted on by The Carson Family and The Carson Family actually, reasonably and detrimentally relied on such. Additionally, because The Carson Family was in a confidential relationship with Defendant, The Carson Family had no duty to exercise due diligence to discover Defendant's bad acts in the first place.

### C.     Unjust Enrichment

39.     The Carson Family adopts and incorporates the allegations contained in

Paragraphs 1-38 above and would show that such allegations evidence unjust enrichment.

40.     Based on Defendant's promises and representations to The Carson Family relative to the Shareholder Agreement in question, The Carson Family were denied the majority control of a very valuable company for which several of the Carson Family worked and were subsequently fired from their positions. Such sums received by Defendant would not otherwise have been received but for the agreements between the parties.   As a result, great financial benefit was conferred on the Defendant to the exclusion of The Carson Family. Defendant accepted the benefit of the monies, but has refused to uphold her duties pursuant to its representations and promises to The Carson Family.   Defendant will be and has been unjustly enriched in the amount if allowed to retain the benefit conferred on her without being required to repay sums equivalent to the amount that Defendant was unjustly enriched.

41.     As a result, The Carson Family has been damaged and is entitled to recover the reasonable value of the benefits conferred on the Defendant.   Additionally, because The Carson Family was in a confidential relationship with Defendant, The Carson Family had no duty to exercise due diligence to discover Defendant's bad acts in the first place.

D.     **Damages**

THE CARSON FAMILY SEEKS MONETARY DAMAGES ONLY

42.     The Carson Family adopts and incorporates the allegations contained in Paragraphs 1-41 above and would show that such allegations evidence unjust enrichment.

43.     Martin's breach of contract in transferring the shares subject of the Shareholder Agreement to a non-contracting party is a natural, probable, and foreseeable consequence of the damages suffered by the Carson Family collectively and individually.   Pursuant to the Shareholder Agreement, the Carson Family is entitled to all legal remedies available to them for

the breach of the Shareholder Agreement by Martin. (Exh. 1, p.12, ¶9.2). Specifically, the Shareholder Agreement dictates that "each party hereto agrees ... to any other remedies available to them at law or equity,.." (Exh. 1, p.12, ¶9.2). This obviously includes monetary damages.

44.     Accordingly, the Carson Family chooses to seek only actual monetary damages against Martin which include but are not limited to economic damages from the dimunition in value of their respective shares, expectation and reliance damages, unjust enrichment, nominal damages, pre-judgment and post-judgment interest, attorney fees, and costs.

45.     The monetary damages sought by the Carson Family are in excess of $2,000,000.00 but less than $8,000,000. The maximum diminution in value damages for their respective two hundred and eighty seven (287) shares of stock sought by each member of the Carson Family is at least $27,292.00 per share based upon the most recent transaction and written offer for shares in Russell E. Womack, Inc. (REWI). In particular, at the time of transfer, seven hundred (700) shares of outstanding stock were issued by REWI. Martin's seventy (70) shares of REWI sold for a fair market value of $3,130,000.00 or $44,714.00 per share to Richard and Mike Byrne. Thereafter, the same purchasers, Richard and Mike Byrne, offered the Carson Family $5,000,000 collectively for the all of their remaining shares in REWI, or the equivalent of $17,422.00 ($5,000,000/287) per share. (Exh. 19). All shares being equal, the sale and offer demonstrate conclusively that the Carson Family Defendant's shares in REWI diminished in value from $44,714.00 per share to $17,422.00 per share after the breach by Martin.

46.     Notwithstanding, assuming all shares are not equal, the most recent transaction and offer dictate that the minimum damage to The Carson Family's shares is $2,091,482.00 for Martin's failure to comply with the contractual obligations. The minimal diminution in value damages for their respective stock sought by each member of the Carson Family is at least

$7,287.00 per share which is demonstrated by first adding the in the combined fair market value of Martin and the Carson Families controlling interest shares based upon the most recent transaction and offer. The total value of Martin's and the Carson Family's share (70 + 287= 357 shares) is $8,130,000.00 ($3,130,000 + $5,000,000). The resulting total indicated enterprise value of REWI would consequently be $15,941,176.00 or $22,773.11 ($15,941,176.00/700 shares).

47.     By her breach, Martin divested the Carson Family of all of their controlling equity of the total indicated enterprise value resulting in the dimunition in value of the Carson Family shares from $22,773.11 to $17,422.00 without any reduction for the customary minority discount.     This is a diminution in the Carson Family per share value of $5,351.11 or $1,535,768.35(287 *$5,351.11) total and is not inclusive of the customary minority discount of 32% of the indicated enterprise value. The minority discount further increases the diminution in value per share of the Carson Family shares from $5,351.11 per share or $1,535,768.35 (287 *$5,351.11) to $7,287.00 per share or $2,091,482.00(287 * $7,287.00). Thus, the minimum diminution in value of the Carson Family shares by Martin's breach is $7,287.00 per share or $2,091,482.00 (287 * $7,287.00).

48.     Moreover, assuming that all shares are not equal, Martin was unjustly enriched for the entire control premium of all parties to the Shareholder Agreement by selling the shares to non-contracting parties in the amount of $1,535,882.00.

E.     **Attorney Fees**

THE CARSON FAMILY IS ENTITLED TO ATTORNEY FEES

49.     The Carson Family incorporates by reference the allegations made in the foregoing paragraphs 1-48.

50.     The Carson Family has been required to retain counsel to prosecute their rights under the Shareholder Agreement. The Carson Family is entitled to recover their attorney fees under Texas Civil Practices and Remedies Code §38.001 *et. seq.*

## VII. CONCLUSION

For the reasons stated herein, the Carson Family asks this Arbitration Panel to enter a judgment for monetary damages inclusive of pre-and post-judgment interest, costs, and attorney fees against Martin.

## IX. PRAYER FOR RELIEF

FOR THESE REASONS, the Purchasers request and pray that:

1.     Martin be cited to appear;

2.     That the Arbitration Panel enter a judgment against Martin for,

   (a)     Actual damages;

   (b)     Nominal damages;

   (c)     Pre-judgment and

   (d)     Post judgment interest

3.     Attorneys' fees expended in such amount as may be found reasonable by the Panel;

4.     and Costs of arbitration including all fees and expenses.

Respectfully submitted,

FIELD, MANNING, STONE,
HAWTHORNE & AYCOCK, P.C.
A Professional Corporation
2112 Indiana Avenue
Lubbock, Texas 79410-1499
806/792-0810 (Telephone)
806/792-9148 (Facsimile)

BY: _____
     J. PAUL MANNING
     State Bar No. 24002521
Attorney for WAYNE CARSON, DEBBIE CHEADLE,
EDWARD CHEADLE, ARTHUR CHEADLE, NANCY
HIGGINSON, FINNEY CHEADLE, CHERYL SHOOP,
KEITH SAWAYA

## CERTIFICATE OF SERVICE

A true and correct copy of the above and foregoing instrument was on this 1st day of October, 2014, served on the attorneys of record as follows:

*Via Facsimile 972-346-6777*
**JEFF LANE**
**LANE LAW FIRM**
3333 Lee Parkway, Ste. 600
Dallas, TX 75219

_____
J. PAUL MANNING

# TAB 4

**From:** J. Paul. Manning [mailto:jpmanning@lubbocklawfirm.com]
**Sent:** Thursday, February 5, 2015 5:42 PM
**To:** AAA Kathleen Cantrell <KathleenCantrell@adr.org>; 'Jeff Lane' <j.b.lane@outlook.com>; Melinda Jayson (jgmelinda@yahoo.com) <jgmelinda@yahoo.com>; Roland Johnson (rolandjohnson@hfblaw.com) <rolandjohnson@hfblaw.com>; Hon. Carlos Lopez (clopez@vilolaw.com) <clopez@vilolaw.com>
**Cc:** Sandra Meeks <smeeks@lubbocklawfirm.com>
**Subject:** Carson et al v. Martin

Pursuant to Ms. Jayson's request, please find the Arbitration Award approved as to form by the attorneys of record.

Thank you all for your time and consideration.

J. Paul Manning
Field, Manning, Stone, Hawthorne & Aycock, P.C.
2112 Indiana AVE
Lubbock, TX 79410
806-792-0810
fax 806-792-9148


Field, Manning, Stone, Hawthorne & Aycock P.C.

THIS MESSAGE MAY CONTAIN PRIVILEGED AND/OR CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATIONS. IF YOU RECEIVE THIS E-MAIL IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY AND DELETE THIS MESSAGE TOGETHER WITH ALL RECORDS OR ATTACHMENTS RELATED THERETO.

FIELD, MANNING, STONE, HAWTHORNE & AYCOCK, P.C. AND SENDER HAVE TAKEN REASONABLE PRECAUTIONS TO ENSURE THAT ANY ATTACHMENT TO THIS E-MAIL HAS BEEN CHECKED FOR VIRUSES. WE ACCEPT NO LIABILITY FOR ANY DAMAGES SUSTAINED AS A RESULT OF SOFTWARE VIRUSES AND ADVISE YOU TO CARRY OUT YOUR VIRUS CHECKS BEFORE OPENING ANY ATTACHMENT.

The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.

# AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| Wayne Carson, Debbie Cheadle, Edward Cheadle, Arthur Cheadle, Nancy Higginson, Finney Cheadle, Cheryl Shoop, and Keith Sawaya, | §<br>§<br>§<br>§<br>§<br>§ | |
| Claimants | §<br>§ | Case No. 01-14-0000-2743 |
| v. | §<br>§<br>§ | |
| Raeanne Martin, | §<br>§ | |
| Respondent | § | |

## ARBITRATION AWARD

After consideration of the evidence, arguments, and authorities presented by counsel for the parties, The Panel finds in favor of Claimants that the "Shareholders Agreement Between Certain Shareholders of Russell E. Womack, Inc." dated January 1, 2008 ("Shareholder Agreement") is valid and enforceable and that Respondent breached the "Shareholder Agreement" by failing to sell and transfer her shares in Russell E. Womack, Inc. to Claimants. The Panel further finds that under the provisions of the Shareholder Agreement the transfer of shares by Respondent to Michael Byrne and Richard Byrne is void, that Claimants are entitled to specific performance of the sale and transfer of Respondent's shares in Russell E. Womack, Inc. and as a result, the Claimants do not have a monetary damage remedy against Respondent for breach of the Shareholder Agreement. These findings do not preclude all or any of the other remedies that may be available to Claimants either under the Shareholder Agreement, or otherwise available at law or in equity.

The Panel further finds the administrative fees and expenses of the American Arbitration Association total _____ and the compensation and expenses of the Arbitrators total - _____.

The Panel further finds that an award of costs of arbitration and attorneys' fees in favor of Claimants as the prevailing parties on the issue of whether Respondent breached the Shareholder Agreement is justified, and hereby awards Claimants the sum total of $400,000.00 determined for arbitration fees, costs and reasonable and necessary attorneys' fees attributable to Claimants' claim against Respondent.

SO ORDERED THIS ___ DAY OF FEBRUARY, 2015:


_____
MELINDA G. JAYSON
ARBITRATOR


_____
ROLAND K. JOHNSON
ARBITRATOR


_____
CARLOS G. LOPEZ
ARBITRATOR

APPROVED AS TO FORM ONLY:

/s/ J. Paul Manning
J. PAUL MANNING
State Bar No. 24002521
FIELD, MANNING, STONE,
   HAWTHORNE & AYCOCK, P.C.
A Professional Corporation
2112 Indiana Avenue
Lubbock, Texas 79410-1444
806/792-0810 (Telephone)
806/792-9148 (Facsimile)
Email: jpmanning@lubbocklawfirm.com
ATTORNEY FOR CLAIMANTS


Jeffrey B. Lane
   Texas Bar. No. 11879270
**Lane Law Firm**
3333 Lee Parkway, Suite 600
Dallas, TX 75219
Telephone (972) 861-0050
Facsimile (972) 346-6777
JeffLane@Lane-Law-Firm.com
ATTORNEY FOR RESPONDENT RAEANNE MARTIN

# TAB 5

CAUSE NO. 2013-506,513

| | | |
|---|---|---|
| RAEANNE MARTIN, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| NANCY HIGGINSON; DEBBIE | § | |
| CHEADLE; EDWARD CHEADLE; | § | |
| ARTHUR CHEADLE; WAYNE | § | |
| CARSON; FINNEY CHEADLE; | § | |
| CHERYL SHOOP; KEITH SAWAYA; | § | |
| MICHAEL V. BYRNE; RICHARD | § | |
| BYRNE; JIM BYRNE, Jr.; BARBARA | § | 72nd JUDICIAL DISTRCT |
| HOLLADAY; WEST WOMACK; and | § | |
| CAROLYN VICTORIA CAIN | § | |
| IRREVOCABLE TRUST, | § | |
| | § | |
| *Defendants and Cross-Plaintiffs,* | § | |
| | § | |
| v. | § | |
| | § | |
| MICHAEL BYRNE AND RICHARD | § | |
| BYRNE, | § | |
| | § | |
| *Cross-Defendants.* | § | LUBBOCK COUNTY, TEXAS |

## AMENDED MOTION TO VACATE OR MODIFY ARBITRATION AWARD

Plaintiff Raeanne Martin ("Ms. Martin") files this *Amended Motion to Vacate or Modify Arbitration Award* and would respectfully show the Court as follows:

### I.    BACKGROUND

The parties to this lawsuit were all shareholders of Russell E. Womack, Inc. ("REW"), a closely-held Texas corporation. Russell E. Womack ("Womack") was the sole shareholder in REW. Upon his death, he left his estate, including ownership in REW, to his and his wife's nieces and nephews. Each of the following individuals were shareholders of REW: Ms. Martin, Nancy Higginson, Debbie Cheadle, Edward Cheadle, Arthur Cheadle, Wayne Carson, Finney Cheadle, Cheryl Shoop, and Keith Sawaya (collectively, "Higginson Parties"), as well as

---

Michael V. Byrne, Richard H. Byrne, James E. Byrne, Jr., Barbara Holladay, West Womack, and Carolyn Cain (collectively, "Byrne Parties").

A sub-set of the shareholders entered into a Voting Trust Agreement dated December 31, 2007 (the "Voting Trust").[1] The parties to the Voting Trust agreed to create a trust to concentrate the votes of their collective shares "into a clear and definite policy of management," which would be voted by certain "Voting Trustees." However, Ms. Martin was free to revoke her Voting Trust Certificate and terminate her participation in the Voting Trust Agreement pursuant to certain conditions.[2] Ms. Martin complied with all conditions and opted out of the Voting Trust in December 2012.[3] Moreover, the Voting Trust did not contain an arbitration clause.

That same sub-set of the Shareholders also entered into a separate Shareholders' Agreement Between Certain Shareholders of Russell E. Womack, Inc. ("Shareholders' Agreement") dated January 1, 2008.[4] Under Section 3.1 of the Shareholders' Agreement, the parties agreed not to "Transfer or permit to be Transferred all or any portion of the Shares now owned or subsequently acquired except in accordance with and subject to the terms and conditions of this Agreement." Section 3.3 sets forth the rights, obligations, and procedures that the Shareholders agreed to follow to effectively sell or transfer shares, which includes providing notice and a right of first refusal to the other parties. Section 9.2 of the Shareholders' Agreement provides:

> Breach and Equitable Relief. *Any purported transfer in breach of any provision of this Agreement is void, will not operate to Transfer any interest or title in the purported transferee,* and will constitute an offer by the breaching Shareholder to sell his Shares in the purported Corporation at the purchase price per Share determined pursuant to Section 7.1 above to be payable in accordance with

---

[1] A true and correct copy of the Voting Trust is attached hereto as **Ex. "A"**, and incorporated herein by reference.
[2] See Section 8.1 of the Voting Trust.
[3] See, First Amended Original Cross Claim at ¶ 7.
[4] A true and correct copy of the Shareholder's Agreement is attached hereto as **Ex. "B"**, and incorporated herein by reference.

Section 7.2(b). In connection with any attempted Transfer in breach of this Agreement, the Corporation may refuse to transfer any Shares or any stock certificate tendered to it for Transfer, in addition to and without prejudice to any other rights or remedies available to the Corporation. Each party to this Agreement acknowledges that each other party will suffer immediate and irreparable harm if a party hereto breaches, attempts to breach, or threatens to breach this Agreement and that monetary damages will be inadequate to compensate the nonbreaching parties for any actual, attempted, or threatened breach. Accordingly, each party hereto agrees that each of the other parties will, in addition to any other remedies available to them at law or in equity, be entitled to specific performance or temporary, preliminary, and permanent injunctive relief to enforce the terms and conditions of this Agreement without the necessity of proving inadequacy of legal remedies or irreparable harm, or posting bond, any requirements to equitable and injunctive relief being hereby specifically waived.

Section 12.5 of the Shareholders' Agreement provides:

Mediation and Arbitration. If a claim, demand, disagreement, controversy, or dispute (collectively, "Dispute") arises in connection with this Agreement or the breach thereof and if the dispute cannot be settled through direct discussions, the parties agree to endeavor first to settle the Dispute in an amicable manner by mediation to be held in Lubbock. ... Thereafter, any unresolved controversy or claim relating to this Agreement or breach thereof will be settled by binding arbitration....

Notably, the Shareholder Agreement did not obligate the parties to vote their shares together in a block and it did not preclude the parties from agreeing to vote their shares as a block with any other shareholder.

In February of 2013, the Byrne Defendants offered Ms. Martin $3,130,000.00 to purchase her shares in REW. On March 4, based on certain representations that Byrnes made to her about the Higginson Parties' mismanagement of REW, which are set forth in detail in Ms. Martin's Second Amended Petition, Ms. Martin conditionally accepted the offer, subject to a right to withdraw from the transaction at any time prior to its consummation. A dispute arose between the parties regarding the parties' rights with respect to the transferred shares.

In April of 2013, Ms. Martin filed this lawsuit, seeking a declaratory judgment that would either confirm the propriety of the transfer of her shares to the Byrnes or confirm her ability to withdraw from that transaction at any time prior to its consummation.

In early May of 2013, the Higginson Parties filed their Verified Original Counter-Petition for Declaratory Judgment and Application for Temporary Restraining Order and Temporary Injunction ("Original Counter-Petition"), asking that the Court prohibit the transfer, find that they had a right of first refusal to Ms. Martin's shares, and order Ms. Martin to sell her shares to them. The Higginson Parties also sought a temporary restraining order to prevent the transfer of Ms. Martin's shares to the Byrnes ("TRO"). Ms. Martin agreed to the TRO.

The TRO expired on September 13, 2013. On September 23, Ms. Martin allegedly transferred her shares to Michael and Richard Byrne ("Putative Share Transfer") pursuant to a Stock Purchase Agreement among the parties dated September 23, 2013.

Following the Putative Share Transfer, the Higginson Parties requested that the dispute between them and Ms. Martin be removed to arbitration, to the exclusion of the Byrnes. Ms. Martin objected to a "piecemeal" resolution of this suit. Ultimately, however, the Court compelled only the Higginson Parties and Ms. Martin to arbitrate their claims. The Byrnes maintained that they were not estopped from avoiding arbitration, and chose not to seek voluntary participation in the arbitration.

The arbitration process began in April of 2014. In the arbitration, the Higginson Parties brought claims against Ms. Martin relating to the Putative Share Transfer.[5]

In October 2014, the Higginson Defendants amended their Petition in Arbitration to seek damages for the alleged diminution in the fair market value of their shares, which they claimed

---

[5] *See also* Response to Petition to Confirm and Enforce Award of Arbitrations; Motion for Leave to Designate Responsible Third Parties.

resulted from the loss of the shares' "control premium" following the Putative Share Transfer, stating specifically: "Martin voluntarily transferred her shares in REWI in breach of the Shareholder Agreement to Richard and Mike Byrne for $3,130,000.00. The breach resulted in the immediate diminution in value of Plaintiffs' shares of stock in REWI . . ."[6] The Shareholder Agreement provides that "Notwithstanding any other provision of this Agreement, no Shares may be Transferred to any Person who is not a party to this Agreement."[7] The Higginson Defendants claimed that the sale of the shares changed the voting control of the company.[8] However, the Higginson Defendants conceded that nothing in the Shareholder Agreement addresses how the parties vote their shares[9] and that any damage from the loss of control actually arose under the voting trust.[10]

The Higginson Defendants and Ms. Martin then engaged in settlement discussions, the result of which was a consent Arbitration Award signed by both the Higginson Defendants and Ms. Martin (the "Consent Award").[11] The Consent Award provided that:

> [The] Shareholders Agreement Between Certain Shareholders of Russell E. Womack, Inc. dated January 1, 2008 ("Shareholder Agreement") is valid and enforceable and that Respondent breached the "Shareholder Agreement" by failing to sell and transfer her shares in Russell E. Womack, Inc. to Claimants. The Panel further finds that under the provisions of the Shareholder Agreement the transfer of shares by Respondent to Michael Byrne and Richard Byrne is void, that Claimants are entitled to specific performance of the sale and transfer of

---

[6] Ex. D at ¶36.

[7] Ex. B at 3.2.

[8] See Deposition Testimony of Kevin McMahon at 61:21-25 ("Q. And it was the sale of the shares, your damage analysis assumes that it was the sale of shares itself that changed the voting control of the company; is that correct? A. Yes, sir."), a true and correct copy of which is attached hereto as **Ex. "C"**, and incorporated herein by reference.

[9] Ex. C at 98:12-99:9 ("Q. Okay. Let me take it from the other direction. Is there something inside the shareholders agreement that makes the shareholder agreement the document that controls the vote of share? ... [Mr. J. Paul Manning] Jeff. Just on the record, we will concede that that issue is not in the shareholder agreement. ...").

[10] Ex. C at 31:23-25 ("Q. And the controlling basis means what? A. The 51 percent controlled by the voting agreement."); and 99:20-25 (Mr. J. Paul Manning: He is not qualified to -- he has not been hired to testify as to what the documents do. *His assumptions are there is a – the shareholder agreement was breached and what is the damage if those shares are allowed to be subject to a voting trust.* ...").

[11] *See* E-mail from J. Manning to Arbitration Panel, attached hereto as **Ex. "G."**

---

Respondent's shares in Russell E. Womack, Inc. and as a result, the Claimants do not have a monetary damage remedy against Respondent for breach of the Shareholder Agreement.[12]

The Consent Award also provided for payment by Ms. Martin of $400,000, to be apportioned between attorneys' fees and arbitration fees by the Arbitrator.[13]  On February 5, 2015, counsel for the Higginson Defendants submitted the Consent Award to the Arbitrators.[14]  The Arbitrator, however, refused to accept or enter the Consent Award.[15]  Because the Arbitrators would not issue the Consent Award, and Ms. Martin was unwilling to amend the terms of the settlement agreement per the Arbitrators's request, the arbitration proceeded to final hearing notwithstanding the settlement agreement.

On June 26, 2015, the arbitration panel found Ms. Martin — the only respondent before it — liable for $2,000,000.00 in monetary damages, plus $322,023.25 in attorneys' fees.  Ms. Martin was left without her shares and with an over $2 million liability.  Plaintiffs have moved to have the Court enter the Arbitration Award.

## II.     MOTION TO VACATE OR MODIFY

The Texas General Arbitration Act allows a party to vacate an award that exceeds the scope of the arbitrators' authority.[16]  As stated by the Texas Supreme Court, "the authority of arbitrators is derived from the arbitration agreement and is limited to a decision of the matters submitted therein either expressly or by necessary implication."[17]  If the parties agree to limit the arbitrators' powers, the arbitrator exceeds his powers if he assumes authority beyond the limits of the contract.[18]  An award that goes beyond the matters submitted for arbitration is void to that extent.[19]  The challenging party bears the burden to establish facts showing the arbitrators

---

[12] *See* Consent Award, attached hereto as **"Ex. H."**
[13] *Id.*
[14] Ex. G (E-mail from J. Manning to Arbitrators).
[15] *See* E-mail from Arbitrators to Parties, attached hereto as **"Ex. I."**

exceeded their powers.[20] A court possesses a duty to vacate an award where, as in the matter of

*Barsness v. Scott*[21], the arbitrators decide a matter not properly before them.[22]

**A. The Arbitrator exceeded his authority by entering an award for damages that, at most, arose under the Voting Trust.**

The only claims that the parties agreed to arbitrate were disputes for breach of the Shareholder Agreement. As stated above, the Higginson Parties claimed that the sale of the shares changed the voting control of the company.[23] However, the Higginson Parties admitted that nothing in the Shareholder Agreement addresses how the parties vote their shares.[24] It is undisputed that the Higginson Parties never owned a majority or the right to control, and thus never had any "control premium." The only "control" that the Higginson Parties had arose as a result of the parties' agreement to aggregate their votes under the Voting Trust, which Ms. Martin had the undisputed right to revoke and terminate her participation in the Voting Trust Agreement, and did. Moreover, nothing precluded Ms. Martin from entering into a voting trust agreement with the Byrne Defendants. Thus, not only did the Higginson Parties, individually, not have any "control premium," any damage from the loss of any purported control premium could

---

[16] TEX. CIV. PRAC. & REM. CODE ANN. § 171.088(a)(3)(A). The Federal Arbitration Act has a like provision.

[17] *Gulf Oil Corp. v. Guidry*, 327 S.W.2d 406, 408 (1959); *Island on Lake Travis, Ltd. v. Hayman Co.*, 834 S.W.2d 529, 532 (Tex.App.—Austin 1992), judgment set aside without reference to the merits and cause remanded for entry of judgment in accordance with the settlement agreement, 848 S.W.2d 84 (Tex.1993).

[18] *Nafta Traders, Inc. v. Quinn*, 339 S.W.2d 84, 90 (2009) (holding that arbitration award was void when arbitrators exceeded their powers by issuing award in contravention of parties' agreement).

[19] *Lone Star Cotton Mills v. Thomas*, 227 S.W.2d 300, 307 (Tex.Civ.App.—El Paso 1949, writ ref'd n.r.e.) (holding arbitration award, which included reinstatement and the payment of damages, void because arbitration agreement did not confer power of decision of these matters).

[20] *In re C.A.K.*, 155 S.W.3d 554, 564 (Tex. App.—San Antonio 2004, pet. denied).

[21] 126 S.W.3d 232, 241 (Tex. App.—San Antonio 2003, pet. denied). *Barsness* is discussed *supra* Part III.B.

[22] *See id.*; *Guidry*, 160 Tex. 139, 327 S.W.2d at 408. In *Guidry*, the Texas Supreme Court reviewed an arbitration award that reinstated an employee after termination following a fight at the work site and imposed punishments or penalties upon the employee. *Id.* at 407. The Texas Supreme Court found that the only issue submitted to the arbitrators had been whether cause existed to terminate the employee. *Id.* at 408. Because the award contained additional provisions relating to penalties imposed upon the employee after reinstatement, the court found that the arbitrators had exceeded their authority and vacated the award. *Id.*

[23] Ex. C at 61:21-25.

[24] Ex. C at 98:12-99:9.

---

only arise from a revocation of the Voting Trust, which the Higginson Parties conceded.[25] The parties did not agree to arbitrate any dispute arising under the Voting Trust or any change in allegiance under the Voting Trust. As a result, the arbitrator did not have the authority to award purported damages for any change in the voting control of the company.

## B. The Arbitrator exceeded his authority by entering an award for damages as a result of a transfer that never occurred.[26]

Section 9.2 of the Shareholder Agreement provides that *"[a]ny purported transfer in breach of any provision of this Agreement is void, will not operate to Transfer any interest or title in the purported transferee*, and will constitute an offer by the breaching Shareholder to sell his Shares in the purported Corporation at the purchase price per Share determined pursuant to Section 7.1 above to be payable in accordance with Section 7.2(b)." As a result, Ms. Martin's putative transfer of her shares to the Byrnes Defendants did not damage the Higginson Parties because section 9.2 of the Shareholder Agreement expressly acknowledges that no transfer is effective, and is actually void, not merely voidable. Thus, even if the purported transfer at issue breached the Shareholder Agreement, any attempt to transfer was void. The term "void" means: "Null; ineffectual; nugatory; having no legal force or binding effect; unable, in law, to support the purpose for which it was intended. An instrument or transaction which is wholly ineffective, inoperative, and incapable of ratification and which thus has no force or effect so that nothing can cure it."[27] Neither the Higginson Defendants nor the Arbitrator had the option to recognize the Putative Share Transfer as effective and award damages, because the transfer was void, not

---

[25] Ex. C. at 99:20-25.

[26] Also attached hereto are the Higginson Parties' First Amended Petition in Arbitration (**Ex. "D"**) and the Award of Arbitrators (**Ex. "E"**). Exhibits A–D were each submitted to the arbitration panel for its consideration. *See also* Joint Exhibit List, attached hereto as **Ex. "F."**

[27] *Commonwealth Land Title Co. v. Nelson*, 889 S.W.2d 312, 318 (Tex. App.—Houston 14th Dist. 1994) (citing BLACK'S LAW DICTIONARY 1573 (6th ed. 1990)).

voidable.[28] All of the Higginson Defendants' damages are based upon the shares being transferred to the Byrnes.[29] But under the contract, no transfer can have occurred. If there is no transfer, there can be no award of damages—thus, although the Shareholder Agreement provides for arbitration, the arbitrators' authority is limited. If the Arbitrator found a transfer in breach of the Shareholder Agreement, he could never award money damages, because to do so would be to recognize a transfer the parties were prohibited from acknowledging and enforcing.

Put differently, the parties to the Shareholder Agreement had already agreed what would occur if a transfer breached the prohibition in Section 3.1: the transfer would be declared void. The Arbtirator's refusal to enforce the contractual remedy in Section 9.2 of the Shareholder Agreement requires vacutur.[30] In *Peacock v. Wave Tec Pools, Inc.*, the Court of Appeals reversed the confirmation of an arbitration award where the arbitrators awarded money damages to an arbitration defendant who had only sought declaratory relief in its Agreement to Arbitrate.[31] Granting monetary relief here rather than the contractual remedy exceeded the authority of the Arbitrator, because he was bound to enforce the contract containing the arbitration clause.

Moreover, the Higginson Defendants even agreed via the Consent Award that the appropriate remedy for any breach of the Shareholder Agreement was for the transfer to be declared void.[32] The voidness of the transaction is not subject to the Higginson Defendants' election of remedies—it is the only possible contractual result of the Purported Transfer, and a

---

[28] *Mr. W Fireworks, Inc. v. Ozuna*, 04-08-00820-CV, 2009 WL 3464856, at *6 (Tex. App.—San Antonio Oct. 28, 2009, pet. denied) (when a contract or act is "void," rather than "voidable," it is of no legal effect and entitles a party thereto to no additional rights under the contract).

[29] Ex. D at ¶36.

[30] *Cf. Delta Queen Steamboat Co. v. Dist. 2 Marine Engineers Beneficial Ass'n, AFL-CIO*, 889 F.2d 599, 604 (5th Cir. 1989) (vacating arbitration award because agreement did not give arbitrator authority to determine remedy, only to find facts).

[31] *Peacock v. Wave Tec Pools, Inc.*, 107 S.W.3d 631, 637 (Tex.App.—Waco 2003, no pet.)

[32] *See* Ex. H (Consent Award).

result that precludes monetary damages.[33] Voiding the Purported Transfer means that the shares return to Ms. Martin's hands, where the Higginson Defendants had no right of control, and where Ms. Martin was already voting against them at the time of the Purported Transfer. There are no loss of control damages under that scenario.

The Arbitrators questioned whether they had the authority to declare the transfer void (1) in the absence of the Byrnes and (2) given the Higginson Defendants' election to seek only monetary damages in their pleadings.[34] However, it was entirely the Higginson Defendants' choice to seek arbitration in the absence of the Byrne Defendants, and to forego a request for the only relief available under the Shareholder Agreement.[35] If the Arbitrator could not grant the Higginson Defendants the only relief they were entitled to under the Shareholder Agreement, this was a reason to award only factual findings and leave remedies to the Court, not grounds to break the Shareholder Agreement.

Under the Shareholder Agreement, the Arbitrator only had authority to decree: (1) the transfer void under the Shareholder Agreement; and (2) that Ms. Martin still owned the shares. Nonetheless, the Arbitrator awarded damages that: (1) did not exist because the transfer was void; and (2) if they did exist, by the Higginson Parties' own admission, resulted from Ms. Martin's revoking and terminating her participation in the Voting Trust; they did not arise under the Shareholder Agreement. The Arbitrator exceeded his authority, and the Court must vacate the Arbitration Award.

---

[33] *See OIAC Commercial Assets, L.L.C. v. Stonegate Village, L.P.*, 234 S.W.3d 726, 740 (Tex. App. — Dallas 2007, pet. denied) (finding that transfer of interest in breach of agreement was "null and void," as required by the agreement) (Texas law); *cf. Joslin v. Shareholders Servs. Grp.*, 948 F.Supp. 627, 632 (S.D. Tex. 1996) ("The Court concludes that the plaintiff has no legal or equitable title to the stock because it was transferred in violation of the stock restriction.") (Delaware law).

[34] Ex. I; Ex. D.

[35] *Piggly Wiggly Operators' Warehouse, Inc. v. Piggly Wiggly Operators' Warehouse Indep. Truck Drivers Union, Local No. 1*, 611 F.2d 580, 584 (5th Cir. 1980) (holding party may limit issues it chooses to submit to arbitrators).

## C. The Arbitrator exceeded his authority by refusing to accept the parties' settlement agreement and enter a Consent Award

Even if the Arbitrator had ever had authority under the Shareholder Agreement to enter monetary damages instead of declaring the Putative Transfer void, he lost the authority to do anything other than apportion fees when the parties submitted the Consent Award. Like any contract, an arbitration agreement may be amended at any time by agreement of the parties.[36] It is well-settled that an arbitrator exceeds his authority when he fails to abide by an agreement to limit his authority, whether it has been made prior or subsequent to the commencement of the arbitration.[37]

The Consent Award was a settlement agreement—one entitled to as much weight as the Shareholder Agreement or a Rule 11 agreement in state court. Subsequent to the submission of the Consent Award, *there was no longer an agreement to arbitrate*.[38] The parties had mutually abandoned any prior agreement to arbitrate their dispute or submit other possible outcomes to the arbitrator in favor of an agreed final resolution—one neither the Court nor the arbitrators may disregard. As one court held,

> Our tradition of deference to arbitral decisions is not based on a solicitude for arbitrators. That tradition is based on our desire to give effect to the parties' chosen means of dispute resolution. When a party claims that the chosen means of dispute resolution is private settlement, we have no reason to defer to the arbitrator's decision. Therefore, we will not defer to the arbitrator's determination of his or her authority to override the terms of a settlement agreement in that narrow category of cases in which a party claims that the chosen means of dispute resolution is private settlement rather than arbitration.[39]

---

[36] *Peacock v. Wave Tec Pools, Inc.*, 107 S.W.3d 631, 639 (Tex. App.—Waco 2003, no pet.) (parties limited arbitrator's authority in submission agreement).

[37] *Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1323 (5th Cir. 1994) (parties could amend scope of arbitrators' power during arbitration).

[38] *See Cooper Natural Res., Inc. v. Intern. Union of Operating Engineers, Local 351*, 4:97-CV-669-A, 1998 WL 25547, at *3 (N.D. Tex. Jan. 12, 1998) ("A second reason that the Arbitrator's award must be set aside is that the Arbitrator usurped the ability of the parties to settle their own dispute by entering into the agreement. . . The parties compromised by entering into the agreement, which was entitled to enforcement as a binding contract.")

[39] *Bakers Union Factory No. 326 v. ITT Cont'l Baking Co., Inc.*, 749 F.2d 350, 354 (6th Cir. 1984).

---

Upon receipt of the Consent Award, the Arbitrator had no authority to do anything but allocate fees. He exceeded his authority by insisting upon further proceedings, declining to award the relief agreed by the parties, incurring more fees, and ultimately awarding a different award than the one agreed to by the parties. Even though the Consent Award still required the Arbitrator's signature to become an enforceable final award in this Court, it was enforceable in arbitration.[40] For these reasons, the Court should vacate the Award entirely as inconsistent with the Consent Award.

## D. In the alternative, the Court should modify the Award to eliminate

As set forth above, the Arbitrator exceeded his authority by awarding monetary damages when the parties agreed that any transfer in breach of the Shareholder Agreement would be void, or for awarding damages under the Voting Trust, which contains no agreement to arbitrate. However, if the Court finds that only the remedy (monetary damages) exceeds the Arbitrator's powers, it should modify the Arbitration Award to provide only the implicit liability finding and fees award, and set this matter for trial on the appropriate remedy under Section 9.2 of the Shareholder Agreement with the participation of the Byrne Defendants.

## E. In the alternative, the Court should postpone entering the any judgment on the Award until all claims pending in this litigation are fully resolved.

For the reasons set forth in Plaintiff's Response to Petition to Confirm and Enforce Award, the Court should defer entering a final judgment on the Arbitration Award because the award is interlocutory and does not dispose of all claims or counterclaims at issue in the litigation, especially in light of the Higginson Parties admission that all damages in this case were caused by the Byrne Defendants.[41] The Award resolves only those limited claims brought by the Higginson Defendants against Ms. Martin in the arbitration. It does not dispose of the claims and cross-claims brought by the Higginson Defendants and

---

[40] *Bakers Union Factory No. 326 v. ITT Cont'l Baking Co., Inc.*, 749 F.2d 350, 355 (6th Cir. 1984) ("[E]ven if the settlement agreement is not final and binding in the sense that it can be enforced in federal court without first having been submitted to an arbitrator, the settlement agreement still is binding on the arbitrator.").
[41] *See, e.g.,* First Amended Original Cross Claim at ¶¶ 8, 28, and 30-35.

---

by Ms. Martin against Michael and Richard Byrne, or address the proportionate responsibility[42] of the Byrnes for the Share Transfer for which, to date, Ms. Martin has alone been held liable.

In addition, for the reasons set forth in Plaintiff's Response to Petition to Confirm and Enforce Award, severance is improper because when a plaintiff seeks damages from multiple defendants for the same injury, the claims against each defendant may not be severed from one another.[43]

## III. PRAYER

For the foregoing reasons, Ms. Martin respectfully requests the Court vacate the Arbitration award and deny the Higginson Parties' Motion to Enter.

Dated: August 19, 2015

Respectfully submitted,

**GRUBER HURST ELROD JOHANSEN HAIL SHANK LLP**

By: */s/ G. Michael Gruber*
**G. Michael Gruber**
*State Bar No. 08555400*
mgruber@ghetrial.com
**Michael J. Lang**
*State Bar No. 24036944*
mlang@ghjhlaw.com
**Laura M. Fontaine**
*State Bar No. 24065239*
lfontaine@ghjhlaw.com
**Priya A. Bhaskar**
*State Bar No. 24082690*
pbhaskar@ghjhlaw.com
1445 Ross Avenue, Suite 2500
Dallas, TX 75202-2711
(214) 855-6800
(214) 855-6808 (Facsimile)

---

[42] As explained in greater detail below and in Ms. Martin's Motion for Leave to Designate Responsible Third Parties, Michael and Richard Byrne are indispensable to and directly implicated in the final resolution of this matter and the ultimate apportionment of the liability currently imposed by the Award on Ms. Martin.

[43] *Jones*, 886 S.W.2d at 821–22; *McRoberts v. Tesoro Sav. & Loan Ass'n*, 781 S.W.2d 705, 706 (Tex. App. — San Antonio 1989, no writ).

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record in accordance with the Texas Rules of Civil Procedure on August 19, 2015.

/s/ Priya A. Bhaskar
Priya A. Bhaskar